PRICE, Judge Pro Tern.
Plaintiff, Sidney Rice Walton, appeals the judgment of the trial court in favor of his employer, Normandy Village Homes Association, Inc. and its insurer, Hartford Accident and Indemnity Company, denying him workmen’s compensation benefits. We affirm the judgment of the trial court for the following reasons.
The record states that plaintiff was born September 20, 1951 and had diabetes melli-tus since he was approximately six or seven years old. Plaintiff had been employed by defendant, Normandy Village Homes Association, Inc., as manager of the complex. Plaintiff performed both managerial and maintenance duties.
On April 23, 1981, the air conditioning unit malfunctioned in the complex’s club house. The unit was located on the roof of the two-story building which was approximately twenty feet above ground. Plaintiff climbed a ladder up to the roof to reset the air conditioner and then returned to the inside of the club house to adjust the thermostat. Plaintiff returned to the roof to put the cover back on the air conditioning unit and as plaintiff was preparing to walk onto the roof from the ladder, the ladder collapsed causing plaintiff to fall onto the concrete surface below.
Plaintiff testified that he lost consciousness for an unknown period of time after the fall. When he came to, he was bleeding, his pants were torn, and he had lost bowel and bladder control. Plaintiff began crawling to a car and was found by a maintenance man who immediately took plaintiff to an emergency room. Plaintiff was treated at the emergency room and released. Plaintiff was found to have a fresh, large hemorrhage in his left eye and had massive hematomas in the lumbosacral area and left buttock. Plaintiff had visual disturbances due to the hemorrhage, complained of difficulty in hearing, and back pain.
Plaintiff was hospitalized on April 29, 1981 until May 3, 1981 and was examined by several physicians. Plaintiff’s hearing and neurological functions were checked. The discharge diagnosis noted the eye hemorrhage and extensive hematomas, as well as diabetes mellitus. The estimated length of disability was six to eight weeks for *1169 significant physical work but office duties were permissible. Plaintiff returned to work but only was able to perform office duties. Plaintiff was taking pain medication and testified that he was in excruciating pain. Plaintiff stated that he had difficulty in moving about and had to stay off his feet.
Plaintiff was hospitalized again on June 4, 1981 until June 5, 1981 for nausea, vomiting, and diarrhea. The diagnosis was acute gastroenteritis.
It appears from plaintiffs testimony that he continued to work until sometime in July, 1981. Plaintiff testified that he had continued to feel sick and went to see his physician, Dr. A.A. Herold. Dr. Herold took several tests and referred plaintiff to Dr. Stephen Youngberg and Dr. Sheldon Kottle who specialized in nephrology, diseases of the kidney. Plaintiff was diagnosed as being in progressive renal failure and a kidney transplant was recommended. Plaintiff was referred to LSU Medical Center and then to University of Minnesota Hospitals in Minneapolis, Minnesota for transplant evaluation. Plaintiff eventually received a kidney transplant on October 6, 1981 at the University of Minnesota Hospitals. The donor was plaintiffs sister.
Plaintiff filed the instant action on November 2,1981 seeking workmen’s compensation. Plaintiff alleged that his condition and inability to work or be gainfully employed was proximately caused by the injuries he received as a result of the fall while in the course and scope of his employment. Plaintiff testified that he has been unable to return to work after receiving the transplant. Plaintiff stated he could perform sedentary work and had done some yard work since the transplant but was unable to engage in any type of manual labor.
At the trial on this matter, there was considerable medical evidence offered by the parties. Dr. A.A. Herold, an internist specializing in the treatment of diabetes, had treated plaintiff since the onset of his diabetes when he was a child. Herold testified that plaintiff suffered from Kimmel-stiel Wilson syndrome, a condition seen in diabetics. It consists of three degenerative elements, the presence of protein in the urine, retinal changes or hemorrhages in the eyes and diastolic hypertension. When plaintiff was hospitalized after his fall, laboratory tests revealed plaintiff had an elevation of creatinine in his blood stream.
Creatinine is one of two waste products which are measured in evaluation of renal function. Creatinine and BUN, blood urea nitrogen, are basic tests of kidney function. The amount of BUN and creatinine present in the bloodstream appears to increase as kidney function becomes progressively impaired. The BUN measurement, however, may vary depending on other factors other than kidney function such as dehydration, diet or acute illness. Creatinine is the most accurate measurement.
Creatinine is a breakdown measurement of muscle in the body and is filtered or excreted by the kidney. As the kidney fails, the creatinine accumulates and the amount of creatinine increases in the bloodstream. The normal range of creatinine content in the bloodstream is one miligram per decimeter in the blood. As the creati-nine originates in muscle, the normal range will vary among different people depending upon their muscle mass.
Dr. Herold testified that a creatinine level above 1.5 miligrams is considered abnormal. Dr. Herold testified that on April 30, 1981, after the fall, plaintiffs creatinine level was 4.1. Previous measurements of the creatinine levels included a measurement of 1.7 in July, 1978, 2.3 on September 25, 1980, and 2.9 on January, 1981. When plaintiff was hospitalized in June, 1981, his creatinine level had decreased slightly to 3.9.
Herold testified that kidney malfunction is associated with a diabetic patient and diabetes is the most common cause of kidney failure. Herold testified that prior to the fall due to plaintiff’s history of diabetes, he knew that plaintiff would require dialysis or a transplant at some point of time. However, there is no medical certainty as to the rate of progression of renal failure. Herold testified that he felt there *1170 was a causal relationship between the rapid elevation of creatinine to 4.1 indicating kidney failure and the fall. Plaintiff was able to work prior to the fall but after the accident, plaintiff went into rapid progressive renal failure. Herold testified that there were two possible ways that the fall could have affected the kidneys. One would be direct trauma to the kidney and the other was that the breakdown products of blood as they were absorbed and excreted from the tissues may have clogged the kidneys preventing the excretion of wastes. Herold testified that he felt that the fall had accelerated the damage to plaintiffs kidneys and had accelerated the date when plaintiff would require a transplant.
However, Herold testified that the rise from 2.3 to 2.9 from September 25, 1980 to January 4, 1981 was fairly rapid and that such rises could happen without precipitating causes. Herold testified that Dr. Youngberg, a nephrologist, would be in a better position than he and surgeons to testify whether the fall had necessitated the transplant.
Herold testified that plaintiff had significant improvement in renal function after the transplant. However, the immuno suppressant drugs which plaintiff must take to prevent the kidney from being rejected does affect plaintiffs ability to work as the drugs significantly reduce plaintiffs resistance to infection.
Two physicians, Dr. Jose Barbosa and Dr. David Sutherland, from the University of Minnesota Hospitals testified by means of written interrogatories.
Dr. Jose Barbosa specializes in endocrinology and metabolism, particularly diabetes and had conducted several examinations of plaintiff and participated in plaintiffs diabetic care. Barbosa testified that plaintiffs fall precipitated renal failure in kidneys previously damaged by diabetes. Barbosa testified his diagnosis of plaintiffs condition as it was related to the injuries from the fall was renal failure triggered by severe trauma with dehydration and internal bleeding in kidneys with a moderate degree of diabetic nephropathy. Although diabetic nephropathy is a progressive disease, Barbosa felt the above mentioned mechanisms resulting from the fall probably had considerable effect in speeding up the process. Barbosa testified that the close relationship between the sudden deterioration and the fall indicated a causal relationship.
Dr. David Sutherland, a surgeon, performed plaintiffs kidney transplant. When asked at what point in plaintiffs history diabetic nephropathy first was diagnosed, Sutherland testified that the 2.3 creatinine level on September 25, 1980 was abnormally high and as plaintiff had been diabetic for many years, the diagnosis at that time was almost certainly diabetic ne-phropathy. Sutherland testified that the plaintiffs fall and resulting trauma could have accelerated the decline in kidney function which had already begun as a result of the diabetes. Sutherland testified that progression of kidney failure is usually slow and the very marked increase in creatinine from January 4, 1981 to April 30, 1981 was statistically unusual. Sutherland felt that the fall and resulting trauma accelerated the progression of plaintiffs kidney disease resulting in deterioration to the point when a transplant was necessary to avoid dialysis treatments.
Sutherland testified that several mechanisms could explain the accelerated development of diabetic nephropathy following the fall. Hemorrhages into the tissues injured by the fall were followed by release of hemoglobin and byproducts of hemoglobin metabolites into the blood plasma. Those substances could have partially clogged the glomeruli or the filters in the kidney. A kidney with already injured glomeruli as a result of diabetic nephropa-thy will be unable to recover from this additional injury. Another mechanism by which the fall may have accelerated renal failure is the induction of a low blood volume state. The hemorrhages into the tissue reduces blood volume which reduces the perfusion of the kidneys by the blood. A kidney already injured by diabetic ne-phropathy is not able to recover from such *1171 damage in the same fashion as a normal kidney.
Dr. Stephen Youngberg, a nephrologist, testified on the behalf of the defendants. As noted earlier, plaintiff was referred to Dr. Youngberg and Dr. Kottle on July 14, 1981 by Dr. Herold. Dr. Youngberg testified that he did not feel that the fall accelerated the course of plaintiff’s diabetic renal disease or necessitated earlier timing of the kidney transplant nor was there evidence that the fall actually had injured the kidneys.
Youngberg testified that a creatinine reading of 1.7 in July, 1978, in a person the size of plaintiff would indicate some dimin-ishment of normal kidney function which would be typical in a juvenile diabetic who had diabetes for a period of nineteen to twenty years. Youngberg testified that a creatinine level of 2.0 would imply the loss of approximately fifty percent of kidney function in an average size person who would be expected to have a creatinine level of 1.0 under normal circumstances. Youngberg testified that the rise in plaintiff’s creatinine from 2.3 to 2.9 which occurred between September, 1980 and January, 1981 was within a typical progression of diabetic renal disease. Youngberg explained that the larger the creatinine numbers become, there is actually less change or impact in overall function of the kidneys. So, for example, a change from 2.0 to 3.0 is more significant than a change from 3.0 to 4.0. Youngberg testified that the rise in serum creatinine measurements is not a linear function but rather a logarithmic or hyperbolic function. Youngberg graphed the data regarding plaintiff’s various crea-tinine measurements to illustrate a medical phenomenon. It appears that if the creati-nine measurements were graphed, they would be increasing in a curvilinear fashion. Youngberg explained that there is a method of normalizing the data by making it into a straight line and that is by showing the reciprocal of serum creatinine or creatinine clearance. In other words, the data which taken on the surface shows as the numbers start to accelerate, is a hyperbolic function. However, normalizing this data by either taking the logarithm of that function or the reciprocal of that function, a linear or straight line could be determined. This changes the data which is a curved line into a straight line. In graphing, the straight line may have a slope which goes up at different levels. However, Youngberg testified that an individual patient is quite faithful to the straight line, that is, once two points are determined on the line, the rate of the progression of their kidney disease progresses quite faithfully at that set rate. In other words, although the rate of progression is variable, for each patient it tends to remain very faithful.
Examining plaintiff’s data, Youngberg testified that the line was faithful to plaintiff’s rate of progression and points determined before the fall have indicated the same straight line as after the fall. In other words, it appears that the general trend in plaintiff’s rate of progression was unchanged by the accident as there was a straight line over the time period of the fall. Youngberg testified that the precipitous change in plaintiff’s kidney condition appears to have occurred between September, 1980 and January, 1981. Youngberg testified the progression from 2.9 in January, 1981 to 4.1 in April, 1981 was typical and was not a rapid rise indicating injury from fall considering all of the pertinent data. Youngberg testified that plaintiff’s kidneys were not stable before the accident nor could plaintiff’s kidney disease be clas.-sified as mild, rather plaintiff was evidencing chronic progression of renal disease.
It was stipulated that if Dr. Sheldon Kot-tle was called to testify, he would testify identically to Dr. Youngberg.
Dr. Jarrell Myrick, a nephrologist, also testified on behalf of the defendant. Myr-ick testified that a change from 2.3 to 2.9 and from 2.9 to 4.1 is entirely typical. Myrick testified it did not appear that the progression of plaintiff’s failure had changed suddenly around April, 1981, the time of the fall and the change from 2.9 to 4.1 did not represent any accelerated de *1172 cline. Myrick testified that there was nothing to indicate that the fall accelerated the transplant or precipitated any renal failure rather, it was just a steady progression. Myrick, like Youngberg, testified that if there was a sudden change in plaintiffs kidney function, it occurred in September, 1980.
Plaintiff was examined by Dr. William Bundrick and Dr. Don Burt on February 11, 1983 for back complaints. Dr. Bun-drick testified by deposition and it was stipulated that if Dr. Burt were to testify, his testimony would be identical to Dr. Bundrick. Dr. Bundrick testified plaintiff did show some evidence of nerve root irritation and a lumbosacral strain. Dr. Bun-drick testified that as the fall occurred almost two years prior to the examination, it would be difficult to say that it had anything to do with the findings. Further, these findings could occur in patients without any history of trauma. There was no testimony as to what extent, if any, plaintiff was disabled by this back condition.
After reviewing the evidence, the trial court found that plaintiff was not entitled to workmen’s compensation benefits. The court noted that Dr. Herold had testified that Dr. Youngberg, a nephrologist, was the medical witness best able to give an evaluation as to the relationship between the kidney failure and the fall. The court concluded that the medical testimony critical to a determination of whether the fall sustained by plaintiff either accelerated or contributed to the subsequent transplant should come from the nephrologists who were unanimous in their opinion that the renal failure was not precipitated by the fall nor was there any evidence of change in the progression of plaintiffs condition.
The court noted that Dr. Youngberg and Dr. Myrick disagreed with the opinions of the physicians who had no expertise in the field of nephrology. The court felt it was apparent that these physicians misunderstood and misinterpreted the mathematical indications of the creatinine level.
The court further found that there was nothing in the deposition testimony of Dr. Bundrick to indicate any disability was sustained by the plaintiff beyond the initial obvious pain and discomfort which plaintiff experienced following the fall. The court found that if plaintiff did have any back condition, it was not related to the accident.
On appeal, plaintiff asserts the following assignments of error:
1. The trial court erred in rejecting plaintiffs demands for benefits under the Workmen’s Compensation Act for total and permanent disability or alternatively for permanent partial disability, together with penalties, attorney’s fees and all costs, holding that plaintiff had not proven a compensable injury; and,
2. The trial court erred in requiring plaintiff to prove by a preponderance of the evidence that his work-related fall was the sole and proximate cause of plaintiff’s kidney failure and the resulting disability.
ASSIGNMENT OF ERROR NO. 1
Plaintiff argues that the court erred in rejecting his claim for workmen’s compensation. Although plaintiff had diabetes for quite some time before the accident, he was able to work but has been unable to work following the accident.
It is not disputed that the plaintiff did have a work-related accident and it certainly appears from the record that plaintiff became disabled from his kidney disease. It is the chain of causation between these events which is at issue.
As noted in Guillory v. U.S. Fidelity & Guar. Ins. Co., 420 So.2d 119 (La.1982), “(w)here there is proof of an accident and of the following disability without any intervening cause it is presumed that the accident caused the disability. It is not necessary to determine the exact cause of the disability.... The criterion for causal connection between the accident and the disability is: ‘has the accident changed the plaintiff’s condition so as to render him disabled and unfit for his former employment...?’ The presumption ... is rebut- *1173 table. Its effect is to shift the burden of proof to the defendant. The defendant bears the burden of coming forward with enough contrary evidence to rebut the presumption.” at pgs. 123-124 (citations omitted). The chain of causation required is that that employment causes the accident, the accident causes an injury and the injury causes the disability.
If there is not proof of an intervening cause, “... claimant’s disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, and symptoms of the disabling condition commenced at the time of the accident and continuously manifested themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition. Robertson v. Scanio Produce, 449 So.2d 459 (La.1984) at p. 461 and citations therein.
It is well-settled that the “... employee in a workers’ compensation proceeding has the burden of establishing the disability and causal relation with the employment accident by a preponderance of the evidence. Nevertheless, it is not necessary for the experts to determine the exact cause of the disability in order for the employee to recover. The complaint need show only by a preponderance of the evidence that somehow the work accident caused the disability. Allor v. Belden Corp., 393 So.2d 1233 (La.1981) at p. 1235-1236 (citations omitted). See also Martin v. H.B. Zachry Co., 424 So.2d 1002 (La.1982). The determination of whether there is a causal relationship between a claimant’s disability and employment is a question of fact. Delco v. Heritage Manor Nursing Home, 441 So.2d 309 (La.App. 3d Cir.1983), writ denied 443 So.2d 1123. The factual findings of the trial court as to a work-related disability are entitled to great weight on appellate review. Martin v. H.B. Zachry Co., supra.
It is clear that a pre-existing condition does not preclude recovery for a disabled claimant, rather the employer takes the employee as he is. The fact that the disease alone may have disabled the plaintiff eventually in its ordinary course of progress is not the inquiry. The claimant’s disability is compensable if the pre-ex-isting disease is somehow activated or precipitated into disabling manifestations as a result of the work-related accident. Hammond v. Fidelity & Cas. Co. of New York, 419 So.2d 829 (La.1982) and Guillory v. U.S. Fidelity & Guar. Ins. Co., supra.
An examination of the record in light of the above jurisprudence reveals that the trial court was not clearly wrong in rejecting plaintiff’s claim for workmen’s compensation benefits.
As noted earlier, the criterion to determine a causal connection between the accident and disability is whether the accident changed the plaintiff’s condition so as to render the plaintiff disabled and unfit for his former employment. Guillory v. U.S. Fidelity & Guar. Ins. Co., supra. See also Bertrand v. Coal Operators Casualty Company, 221 So.2d 816 (La.1968). The evidence at trial reveals the accident did not change plaintiff’s condition.
Plaintiff had diabetes for approximately 20 years before the accident and the record reveals that he had suffered health problems associated with that illness, such as eye hemorrhages, hypertension, and kidney nephropathy. However, plaintiff was able to work and was gainfully employed at the time of the accident.
It appears that the physicians testifying on the behalf of plaintiff, Herold, Barbosa and Sutherland, based their opinion that the fall accelerated plaintiff’s kidney disease and the timing of the transplant upon the seemingly rapid rise of plaintiff’s crea-tinine level from 2.9 to 4.1 between January and April, 1981. These physicians felt that plaintiff’s kidney disease was “mild” and “stable” before the accident. However, the nephrologists testified that this was not in fact a rapid rise when considered in light of all of the pertinent data. The nephrologists, Youngberg and Myrick *1174 concluded that if there was any sudden worsening of plaintiffs kidney disease, it occurred between September, 1980 and January, 1981 when plaintiffs creatinine level rose from 2.3 to 2.9. In graphing plaintiffs data, Dr. Youngberg illustrated that the creatinine rise from 2.9 to 4.1 was not unusual but rather a fairly typical rate of progression in light of all the data.
It appears that the trial court afforded more weight to the nephrologists’ testimony than to the testimony of the other physicians who did not specialize in nephrology. It is well-settled that the trial court is in the best position to evaluate the credibility of witnesses and further that the “... opinion of an expert within whose specialty the subject falls is entitled to greater weight than one whose specialty does not encompass the subject.” Benoit v. Ryan Chevrolet, 428 So.2d 489 (La.App. 2d Cir.1982) at p. 491. The court noted that it appeared that the physicians who had no expertise in the field of nephrology misunderstood and misinterpreted the mathematical indications of the creatinine level.
As noted earlier, the fact that plaintiff had a pre-existing disease or condition or that plaintiff would have eventually required a transplant would not act to preclude recovery. The crucial question for determination is whether the accident changed plaintiffs condition. The evidence reveals it did not. The testimony of the nephrologists is clear that plaintiff had severe kidney nephropathy before the fall with a creatinine level of 2.9 in January, 1981. The seemingly rapid rise of plaintiffs creatinine level after the accident did not evidence a change of plaintiffs condition but rather simply reflected a typical rate of progression. It does not appear that plaintiffs symptomatology changed nor did his condition worsen after the fall. Examining plaintiffs history prior to the fall in light of the medical testimony reveals that the accident did not accelerate plaintiffs kidney disease or necessitate earlier timing of the transplant. It appears that plaintiffs kidneys were failing before the accident and this rate of progression continued in the same overall trend after the accident.
Defendants argue that as plaintiff was not an “otherwise healthy worker” before the accident due to a pre-existing disability and as there appeared to be no change in plaintiffs condition after the fall, this should obviate the application of the presumption that the accident caused the disability when there is proof of an accident and a following disability without any intervening cause.
It is clear that even if the presumption enumerated in Guillory v. U.S. Fidelity & Guar. Ins. Co., supra, was applied in the instant case without regard to plaintiffs pre-existing condition before the fall, it has been rebutted by the defendants’ medical testimony that the accident did not accelerate plaintiff’s kidney disease or change his general condition.
The court was not clearly wrong in finding that plaintiff had failed to prove any disability from back injuries allegedly resulting from the fall. The protracted length of time between the date of the fall and plaintiff’s medical examination made it quite difficult for the physicians to connect plaintiff’s back condition to the trauma incurred as a result of the fall. Further, there was no evidence as to the extent that plaintiff was disabled, if at all, by his back condition.
ASSIGNMENT OF ERROR NO. 2
Plaintiff argues that the court erred in requiring plaintiff to prove by a preponderance of the evidence that his work-related fall was the sole and proximate cause of plaintiff’s kidney failure and resulting disability. This argument is without merit.
An examination of the record evidences that the court did not apply such an onerous burden of proof but rather applied the appropriate standard, that is, whether the accident changed plaintiff’s condition so as to render him disabled. After examining the evidence, the court simply found that the evidence did not substantiate a finding *1175 that the accident had changed plaintiffs condition.
For these reasons, the judgment in favor of defendants, Normandy Village Homes Association, Inc. and Hartford Accident and Indemnity Company, is affirmed at plaintiffs, Sidney Rice Walton’s, costs.
AFFIRMED.