475 So.2d 320 (1985)
Sidney Rice WALTON
v.
NORMANDY VILLAGE HOMES ASSOCIATION, INC., et al.
No. 85-C-0034.
Supreme Court of Louisiana.
September 10, 1985.
Rehearing Denied October 10, 1985.
*323 Donald R. Miller, Shreveport, for plaintiff-applicant.
Charles G. Tutt, Cook, Yancey, King & Galloway, Shreveport, for defendant-respondent.
DENNIS, Justice.
This is a worker compensation case in which an employee, who suffered from a preexisting diabetic kidney disease, fell from a height of twenty feet to a concrete surface. Before the accident he did not suffer from any disabling symptoms and was able to perform fully the manual labor functions of his job. Since the accident he has been unable to do manual labor due to the progression or aggravation of his kidney dysfunction. A kidney transplant recommended eleven weeks after the accident and successfully performed five months post accident has restored his kidney function, but drugs administered to prevent organ rejection prevent him from doing heavy labor. The work-related accident and the disability which resulted from the aggravation or progression of the kidney dysfunction are undisputed. Whether the work injury accelerated or aggravated the kidney condition was the crucial question. Both previous courts rejected the employee's compensation and medical expense claim finding that the accident had not contributed in any way to his disability but that his diabetic kidney disease had progressed naturally and independently to cause disability which commenced coincidentally with the accident. We granted certiorari, 462 So.2d 1254 (La.1985), and now reverse. The trial court and court of appeal, 460 So.2d 1166 (La.App.1984), either failed to apply or misapplied the presumption of causation established in the employee's favor upon proof of the accident and his ensuing disability. The defendants clearly failed to carry their burden under the presumption to prove that it is more probable than not that the work injury did not accelerate, aggravate or combine with the preexisting disease to produce the employee's disability.
Sidney Walton worked for Normandy Village Homes Association, Inc. and had been employed by that company as property manager for approximately one year prior to his accident on April 23, 1981. He performed managerial, maintenance and manual labor duties. While he was climbing to the roof of a two-story building to replace the cover on an air conditioner, the ladder supporting him collapsed and he fell twenty feet to a concrete surface. The force of the fall caused Walton to lose bowel and bladder control and rendered him unconscious. He was taken to a hospital, treated and released. His injuries included massive hematomas in the lumbosacral and left buttock area, hemorrhage in his left eye, visual disturbances, hearing difficulty and back pain.
Walton attempted to return to work but was unable to perform most of his duties. Because his condition failed to improve, he was hospitalized from April 29, 1981 until May 3, 1981. He was examined by two physicians who checked his hearing and neurological functions, as well as his kidney function. Upon discharge, he was released to return to office duties but his estimated length of disability for significant physical work was six to eight weeks.
Plaintiff returned to work but was only able to perform office duties. He was not able to do any physical work and had to stay off his feet. He took pain medication and had extreme nausea and diarrhea. After experiencing no improvement, plaintiff was rehospitalized on June 4 and 5, 1981 for nausea, vomiting, diarrhea and gastroenteritis. Plaintiff's gastrointestinal condition improved, prompting his discharge.
Plaintiff again returned to work, although he apparently still was unable to *324 perform all of his former employment duties. Although plaintiff continued to feel ill, he performed the managerial functions of his job until he returned to his physician, Dr. Herold, in July, 1981. After performing tests, his doctor determined that his kidney dysfunction had progressed, indicating that dialysis or a kidney transplant should be considered. Dr. Herold referred plaintiff to Drs. Youngberg and Kottle, nephrologists, for their evaluation and recommendations. They diagnosed him as being in progressive renal failure and recommended a kidney transplant because he had a sister who was an eligible and willing organ donor.
In August, 1981, plaintiff went to the University of Minnesota for evaluation for kidney transplant surgery. At the University of Minnesota, one of the few institutions where kidney transplants were performed at that time, plaintiff was attended by Dr. Sutherland, his surgeon, and Dr. Barbosa, who treated his diabetic condition. After tissue typing and further testing of kidney function, plaintiff's transplant surgery was planned for October. He returned to the University of Minnesota on October 3, 1981, and had successful transplant surgery on October 6. His new kidney functioned normally at the time of trial, although he faces the prospect of increased susceptibility to infections for the rest of his life due to his need to take drugs which suppress the body's natural immune system.
Hartford Accident & Indemnity Company, Normandy Village Home Association's workmen's compensation insurer, paid plaintiff $69.85 in compensation for the period of disability immediately after the fall and also paid plaintiffs medical expenses incurred during his initial hospitalization from April 29 to May 3, 1981. However, the defendants have refused to pay any other compensation or medical expenses relating to the April 23, 1981 accident.

Legal Precepts
As in other civil suits the employee in a worker compensation proceeding initially has the burden of establishing his disability and its causal relation with the employment accident by a preponderance of the evidence. Lucas v. Ins. Co. of N.A., 342 So.2d 591 (La.1977); Prim v. City of Shreveport, 297 So.2d 421 (La.1974). Malone & Johnson, 13 Louisiana Civil Law Treatise, Worker's Compensation (2d ed.) § 256, p. 562. In order for the employee to recover, it must be determined that the employment somehow caused or contributed to the disability, but it is not necessary that the exact cause be found. Lucas v. Ins. Co. of N.A., supra; Malone & Johnson, supra. A claimant's disability is presumed to have resulted from an accident, however, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing either that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition, Allor v. Belden Corp., 393 So.2d 1233 (La.1981); Lucas v. Ins. Co. of N.A., supra, or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection. Haughton v. Fireman's Fund American Ins. Cos., 355 So.2d 927 (La.1978); Cf. Thomas v. U.S. Cas. Co., 218 Ga. 493, 128 S.E.2d 749 (1962); Malone & Johnson, supra.
Preexisting disease or infirmity of the employee does not disqualify a claim if the work-injury aggravated, accelerated, or combined with the disease or infirmity to produce death or disability for which compensation is claimed. Lucas v. Ins. Co. of N.A., supra; Johnson v. Travelers Ins. Co., 284 So.2d 888 (1973); Larson, Workmen's Compensation Law, § 12.21, p. 3-336. Correlatively, when an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident the disabling symptoms appeared and manifested themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection *325 between the accident and the activation of the disabling condition, the employee's work injury is presumed to have aggravated, accelerated or combined with his preexisting disease or infirmity to produce his disability. Haughton v. Fireman's Fund American Ins. Cos., supra; Hammond v. Fidelity & Cas. Co. of New York, 419 So.2d 829 (La.1982).
Once the disabled employee establishes the presumption of a causal relationship, the party denying the existence of the presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue. See McCormick on Evidence (2d ed.) § 342, p. 802. In other words, in order for the party denying the existence of the presumed causal relationship to prevail on the issue, he must produce evidence and persuade the trier of fact that it is more probable than not that the work-injury did not accelerate, aggravate or combine with the preexisting disease or infirmity to produce his disability. See McCormick, supra, § 345, at p. 826.
The effect of the presumption is not so slight and evanescent that it is spent and disappears upon the mere production of evidence by the adversary. It is a true presumption which has been created for policy reasons that are similar to and just as strong as those that underlie the compensation principle itself: the probability of the causal connection under the circumstances which give rise to the presumption, the difficulty of proving causation with testimony by medical experts often sharply divided by differing schools of opinion, and the desirability of reducing the margin of error inherent in litigation as to a disabled employee, both because he has at stake an interest of transcending valuehis and his family's livelihoodand because those persons who enjoy the product of a business should ultimately bear the cost of injuries or deaths that are incident to the manufacture, preparation and distribution of the product. See Malone & Johnson, supra, at § 32, p. 38; McCormick, supra, § 345, at p. 822; Cf. Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).

Plaintiff's Evidence Establishing Presumption of Causation
Sidney Walton testified that before the accident he led a normal life, characterizing himself as a workaholic. He gave himself daily insulin injections, but experienced no disabling symptoms. The testimony of the plaintiff's wife, Deborah Walton, confirms his normal and active lifestyle prior to the accident. They both testified that after his treatment at the emergency room, Walton returned to work, but could only perform office duties. Both also testified that after his hospitalization from April 29 through May 3, 1981, Walton experienced continuing nausea, diarrhea and loss of weight, leading to further hospitalization on June 4 through 5, 1981. Mrs. Walton added that the plaintiff was very lethargic, spending most of his time at home in bed. The two further testified that the gastrointestinal and weight loss problems returned after the June hospitalization, eventually leading Dr. Herold to refer the plaintiff to the nephrologists. After the kidney transplant the plaintiff's gastrointestinal problems disappeared, and he has been able to engage in more activities.
Dr. A.A. Herold, plaintiff's principal treating physician, is an internist specializing in the treatment of diabetes. He is a diabetic. He treats diabetic patients for all aspects of kidney problems associated with the disease, up until the time patients require dialysis or transplant. He had practiced medicine in his speciality for thirty-five years. He was clinical Associate Professor of Medicine, LSU School of Medicine, Shreveport, and a guest lecturer in diabetes. He had served as former president of the Louisiana Diabetes Association and was a member of the Southern Sugar Club, and the American Diabetes Association. As well as his daily practice, his teaching and association activities, Dr. Herold testified that he kept abreast of developments in the treatment of diabetes by reading pertinent medical journals and other literature on the subject. Nephrology *326 was among the subjects of which he kept abreast, due to the frequency of kidney problems in diabetics.
Dr. Herold testified that he had treated Walton since Walton developed diabetes at six years of age. He also treated Walton for the injuries he received in his work accident on April 23, 1981. At this time, Dr. Herold said Walton had extensive loss of blood into tissues of the low back, left buttock and left upper thigh with blood extravasated out into the tissues. At this time he also had a sharp elevation of his body's waste products, normally filtered out of the body by the kidneys into the bloodstream, which Dr. Herold said was by far the highest that Walton had experienced and indicated progressing renal dysfunction. After Walton's hospitalization, he failed to regain the kidney function that Dr. Herold felt that he should. Dr. Herold added that Walton's recovery was slow; he had continued soreness and weakness if he stayed at work for any significant period of time, ultimately becoming too weak to work. Dr. Herold later referred him to the nephrologists for transplant or dialysis evaluation.
Dr. Herold has continued to treat Walton after his kidney transplant. He stated that Walton has made a significant improvement in his renal function, has continued to have some elevation of blood pressure, but less than before the transplant. Because Walton must take immuno-suppressive agents in order to prevent rejection of the transplanted kidney, he has less resistance to infection or trauma. Therefore, Dr. Herold advised that Walton should not engage in the work he was doing before as a general supervisor, general maintenance man at the apartment project which required some manual labor. He said even a simple cut or a simple upset stomach in a person whose immune system is compromised is a serious problem.
Dr. Herold testified that there was a causal relationship between the fall and the injuries he had received and his disability due to the aggravation of his kidney dysfunction. Dr. Herold based this opinion on the fact that Mr. Walton was working and was gainfully employed prior to the fall but was unable to work after the fall and subsequently went into rather rapidly progressive renal failure. Another basis for the doctor's conclusion was that immediately after Walton's fall, laboratory tests indicated a substantial elevation of the creatinine content in Walton's blood.
There were two possible ways in which the trauma which Walton received in the fall could have affected his kidneys, according to Dr. Herold. He said that with a fall of that magnitude it is quite likely that Walton's kidneys received a direct trauma from the fall. Secondly, the breakdown products of blood caused by the fall as they were absorbed and excreted from the tissues could have clogged the part of Walton's kidney that is involved in the excretion of wastes and could have prevented that excretion.
Dr. Herold in part based his opinion that the accident causally contributed to the progressing renal failure on measurements of the creatinine level in Walton's blood during the period before and immediately after the fall. Dr. Herold explained that the most reliable test for evaluating renal function is measurement of creatinine. This is a measurement of waste products which are primarily produced by muscle activity in the body that must be filtered out through the kidneys. As the kidneys fail progressively, the creatinine backs up into the blood stream. Thus, the degree of kidney failure may be estimated by measuring the creatinine in the patient's blood.
Dr. Herold noted that 1.5 milligrams per deciliter is considered normal and that Walton had a creatinine level of 2.3 in September of 1980, 2.9 in January of 1981, and 4.1 one week after the April 23, 1981 accident. He testified that the creatinine levels through January, 1981, reflected a fairly typical progression of renal failure, but that the rise in creatinine to 4.1 immediately after the accident indicated a sudden worsening of Walton's condition precipitated by the fall, especially considering the short time between the 2.9 level in January, *327 1981, and the 4.1 level just after the accident.
Dr. Jose Barbosa, Associate Professor of Medicine, Division of Endocrinology and Metabolism, at the University of Minnesota, specializes in endocrinology, metabolism and particularly diabetes, and participated in Walton's diabetic care while Walton was at the University for his kidney transplant. Dr. Barbosa, testifying by interrogatories, agreed that plaintiff's accident had a considerable effect in speeding up the progression of his renal failure. Dr. Barbosa added that there are at least two ways such trauma could have accelerated renal failure, one being dehydration of the body and another being internal bleeding.
Dr. David Sutherland, Associate Professor of Medicine at the University of Minnesota, specialized in general and transplant surgery, and performed Walton's transplant. Through interrogatory answers, Dr. Sutherland also agreed that Walton's accident accelerated the progression of his renal failure, necessitating transplant surgery much earlier than would have been required had the fall not occurred. Dr. Sutherland stated that such acceleration could have been caused directly by trauma to the kidneys in the fall, or indirectly by clogging the glomeruli (the kidneys' filtering mechanism) with hemaglobins released into the blood in response to the hemorrhaging into body tissues caused by the impact of the fall. He also stated that another way this hemorrhaging could cause acceleration of renal failure is by inducing a lower blood flow volume, depriving the kidneys of optimal blood flow for that period of time and consequently leading to a further loss of kidney function.
Thus, Walton satisfactorily proved that before the accident he was fully performing all of the duties of his job without any disabling symptoms, that commencing with the accident he has been disabled continuously to perform his physical labor duties, and that there is both medical and circumstantial evidence indicating a reasonable possibility that his work injury aggravated, accelerated or combined with his preexisting diabetic kidney disease to produce his disability. Consequently, it became the burden of the defendants to prove the absence of any causal relationship between the accident and the aggravation or progression of the plaintiff's kidney dysfunction.

Defendants' Rebuttal Evidence
The evidence introduced by the defendants consisted of testimony by Drs. Stephen Youngberg, and Jarrell Myrick, and a stipulation as to the testimony of Dr. Sheldon Kottle. It is upon this evidence which the defendants must rely to overcome the presumption and to prove by a preponderance of the evidence that the work injury did not to any extent aggravate, accelerate or in any way combine with the preexisting disease to produce Walton's disability.
Dr. Youngberg testified that he was a subspecialist in internal medicine, specializing in diseases of the kidney, with seven years experience in the subspecialty of nephrology. He first saw Walton on July 14, 1981, approximately eleven weeks after his accident. Dr. Youngberg did not take a written history from the patient, and the one taken for him by a medical resident did not mention the accident. Apparently, Dr. Youngberg did not consider whether Walton's twenty foot fall could have been a factor in accelerating or aggravating his kidney disorder until this litigation arose. Prior to giving his testimony, Dr. Youngberg had been discharged by Walton and replaced with another physician.
When Dr. Youngberg was asked to express an opinion as to the existence of a causal relationship, he testified that the data available to him did not contain any evidence that the accident accelerated or aggravated the kidney disease. This information consisted primarily of the three measurements of Walton's creatinine content performed by other doctors and laboratories. Dr. Youngberg was of the opinion that these three measurements, i.e., 2.3 in September, 1980, 2.9 in January, 1981, and 4.1 a week after the April 23, 1981 accident, reflected only a normal progression of Walton's diabetic renal disease. He explained *328 that the disease's rate of progression usually is reflected by a logarithmic or hyperbolic function, not a linear function. Dr. Youngberg conceded that when Walton's three measurements were entered on a graph, they described a line which appeared to change precipitously near the time of the accident. Nonetheless, he testified, when this data is "normalized", by showing the reciprocals of these entries, the curved line would be changed into a straight line consistent with a normal progression of the kidney disease. However, the medical treatises which Dr. Youngberg testified explain this phenomenon were not introduced into evidence, and he did not make plain or understandable why the mathematical procedure of normalization must be accepted as an accurate reflection of the actual progression of Walton's renal failure. Dr. Youngberg conceded that creatinine measurements are considered to have a limited accuracy of plus or minus 4/10ths of a milligram between the creatinine levels of 0.5 and 2.0. Above the creatinine level of 2.0, he said, the margin of error is even greater because the serum must be diluted out in performing the test. Furthermore, he testified, the actual readings may differ slightly according to variations between individual laboratories.
On cross examination, Dr. Youngberg's attention was directed to a fourth creatinine measurement, not included in his graph data, performed on June 4, 1981, which showed a level of 3.9. He was asked if this reading, following the preceding measurements of 2.3, 2.9 and 4.1, showed a recession of Walton's creatinine following its elevation near the time of the accident, indicating a traumatic acceleration of the kidney disorder. Dr. Youngberg conceded that he had not previously incorporated the 3.9 measurement in his analysis but maintained that with its insertion Walton's readings would still reflect the "general trend" of normal progress in his kidney disorder. He also suggested that, because of the margin of inaccuracy and variable nature of creatinine test readings, a measurement of 3.9 is practically the same as one of 4.1.
Dr. Jarrell Myrick, an assistant professor in medicine at LSU Medical School in Shreveport and a practitioner in nephrology since 1979, formerly had practiced with Drs. Youngberg and Kottle but not during the time Walton was their patient. He did not examine or treat Walton. In his testimony, Dr. Myrick agreed with all of Dr. Youngberg's conclusions but added no new evidence or reasoning in support of them.
The parties stipulated that Dr. Sheldon Kottle, a nephrologist practicing with Dr. Youngberg, if called, would have testified the same as Dr. Youngberg.

Application of Precepts
Applying the precepts to the evidence in this case, we conclude that the previous courts either erred legally by failing to afford plaintiff the benefit of the presumption of causation or erred manifestly by determining that the defendants had proven it to be more probable than not that the work injury did not in any way accelerate, aggravate or combine with the preexisting disorder to produce the employee's disability.
Once the plaintiff proved the basic facts giving rise to the presumption, it became the defendant's heavy burden to prove by a preponderance of the evidence the absence of any correlation between the work injury and the employee's disability. The brief mention and summary disposition of the presumption by the previous courts indicates either that they failed to shift any burden to the defendants or that they assigned defendants only the burden of producing evidence and not the burden of persuasion as well. For the reasons we have assigned, the plaintiff is entitled to a true presumption, which assigns both the burden of proof and burden of production of evidence to the defendants. When these burdens are correctly assigned, and the evidence is properly weighed in accordance with them, it is manifest that the defendants failed to carry their burden of proof.
It is undisputed that Walton performed each aspect of his employment duties fully and effectively up to the moment of his twenty foot fall to the concrete. *329 It is equally without dispute that he has been unable to perform manual labor since the accident due to the worsening of his kidney dysfunction and subsequent transplant. From the practical viewpoint of a layman, this circumstantial evidence itself convincingly indicates that the accident and the disability were not merely coincidental but that they were causally related.
The doctor who treated Walton for his diabetes from the time he was six years old, who treated and observed him immediately following his fall from the ladder, and who recommended he seek dialysis or a transplant was of the opinion that the accident accelerated, aggravated and combined with the diabetic kidney disease to produce the disability. The doctors who removed his impaired kidney, replaced it with his sister's healthy organ, and took care of him during this transplant program were also of the view that the progression of his kidney disorder had been hastened by the trauma. These doctors had impressive credentials. One had many years experience in the practice of medicine, including thirty-five years of specialization in the treatment of diabetics, and the practical experience of being a diabetic himself. Two others were doctors serving at one of the nation's foremost pioneer kidney transplant institutions. All of these doctors had the practical advantage of having personally treated and observed Walton for sustained periods. This is particularly true of Walton's regular physician who treated him most of his life as well as at the critical time immediately following the accident.
The testimony of the defendants' doctors failed to prove that it was more probable that the accident did not accelerate, aggravate or combine with the preexisting disease to any extent to produce the disability. Of the two doctors who actually testified for the defendants, only one had ever seen Walton. Insofar as the record discloses, his treatment of Walton commenced eleven weeks after the accident and consisted mainly of reading the results of a lab workup and referring Walton to the University of Minnesota Hospital for a transplant. His opinion that the progression of Walton's diabetic kidney dysfunction fit a normal pattern and was not accelerated or aggravated by his accident was based almost exclusively on the results of three creatinine measurements performed by other doctors and laboratories that he obtained as second hand information over the telephone. A graph of these three measurements used by the doctor in his testimony tends to show that the creatinine content of Walton's blood curved precipitously upward at the time of the accident. The doctor asserted that when this data is "normalized" it describes a straight line consistent with normal disease progression. In the absence of a more complete explanation of the underlying theories justifying his normalization of the data and of the process used in adjusting the data, however, his conclusion does not convincingly demonstrate that the curved line actually represents a straight one. Furthermore, the doctor frankly conceded that each creatinine measurement is subject to individual laboratory variations, a margin of error of plus or minus 4/10ths of a milligram between levels .5 and 2.0, and an even greater margin of error at higher levels, such as Walton's measurements of 2.3, 2.9, 4.1, and 3.9. In fact, the totality of the testimony of the doctors for the defendants suggests the creatinine tests are used primarily to show the general trend of the disease's progression; and that they are poor tools for detecting accelerations caused by bodily injury, particularly when only three measurements have been made at infrequent intervals.
Defendants had the burden of proving that the non-existence of the presumed fact, i.e., that the work injury accelerated, aggravated or combined with the preexisting dysfunction to produce disability, was more probable than its existence. In applying this burden of proof, the trier of fact was required to decide the issue in favor of the employee if the trier of fact was convinced that existence of the presumed fact was more probable than its non-existence, that its existence was at *330 least as likely as its non-existence, or if the trier of fact was in doubt as to its existence or non-existence. In our opinion, any reasonable trier of fact correctly applying this burden to the conflicting medical opinion evidence in this case would either conclude that the evidence clearly preponderates in favor of the existence of the presumed fact or find himself in doubt on this issue, and therefore would find the existence of the presumed fact. McCormick, supra, § 336. Accordingly, we find that Walton's work accident accelerated, aggravated and combined with his preexisting kidney dysfunction to produce his disability.

Back Injury Claim
Plaintiff also claimed disability benefits as the result of an alleged back injury sustained in the work accident. The trial court rejected this claim, and the court of appeal affirmed because the evidence of a connection between the accident and the back condition was attenuated by the protracted period which elapsed before a medical examination for that injury and because there was no evidence of disability caused by the back condition. We have reviewed the evidence of record pertaining to the back injury and agree that the trial court committed no manifest error in this regard.

Extent of Disability
We find that Walton is permanently and partially disabled within the meaning of La.R.S. 23:1221(3). The preponderance of the evidence shows that Walton can no longer perform the "duties in which he was customarily engaged when injured or duties of the same or similar character, nature, or description for which he was fitted by education, training, and experience." The medical testimony established that resumption of heavy manual labor would be detrimental to Walton's health and could have disastrous consequences. His doctors did not rule out a wide range of jobs with lesser physical requirements, however. Walton testified that in his opinion he would be able to do sedentary work such as bookkeeping or accounting. Walton completed high school and obtained several college credits in business and accounting courses. He has varied work experiences, having done bookkeeping and accounting, figured corporate taxation, and performed general managerial services for the defendant employer alone. We do not find that the claimant has established a prima facie case of odd lot status so as to be entitled to total permanent disability benefits. His education, training, and physical condition are such that it cannot be said he is at a severe disadvantage in competing with others in any recognized labor market. See Oster v. Wetzell Printing, Inc., 390 So.2d 1318 (La. 1980). We believe less strenuous jobs could be performed by the plaintiff without substantial pain or detriment to his health.
From the record presented for our review, we find also that the claimant's accident must have caused him to be totally disabled for a temporary period beginning with his accident and extending perhaps to a point beyond his kidney transplant operation. The record does not contain sufficient evidence for us to fix the parameters of this total temporary disability. Accordingly, we will remand this case to the trial court so that it may have an opportunity to take additional evidence or a stipulation from the parties in order to enter a proper decree consistent with our opinion herein.

Penalty and Attorney's Fees
Walton claims that he is entitled to a twelve percent penalty and reasonable attorney's fees for the arbitrary and capricious failure by the defendant to pay his compensation claim. La.R.S. 23:1201.1. Defendants were not unreasonable, however, in relying on the expert opinions of the nephrologists that Walton's disability was not related to his work injury. Although their opinions were not sufficient to carry defendant's burden of proof at trial, these medical experts presented respectable opinions disputing the causal relationship. The defendants were not arbitrary or capricious in acting thereon. Hammond v. *331 Fidelity and Casualty Co. of New York, supra.

Conclusion
In summary, we conclude that the plaintiff is entitled to total, temporary disability compensation from the date of his accident for a period or periods to be determined by the trial court upon remand of this case. After his final total, temporary disability period, the plaintiff is entitled to permanent, partial disability compensation and medical expenses related thereto including his kidney transplant. Plaintiff is not entitled to compensation for his back injury, penalties or attorney's fees. The case will be remanded to the trial court for the taking of additional evidence if necessary and the rendition of a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; REMANDED TO THE TRIAL COURT.
MARCUS, J., concurs in the result.
BLANCHE, J., dissents and will assign reasons.
LEMMON, J., dissents.
BLANCHE, Justice (dissenting).
The majority concludes that the trial judge committed manifest error when he found that no causal connection existed between Walton's work accident and his subsequently arising kidney problems. In concluding that causation does in fact exist, the majority ignores the well established principle that a trial court's factual finding is entitled to great weight. When the evidence presented furnishes a reasonable factual basis for the trial court's finding, it should not be disturbed. Martin v. H.B. Zachry Co., et al, 424 So.2d 1002 (La.1983); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300 (La.1979); and Cadiere v. West Gibson Products Co., 364 So.2d 998 (La.1978).
The court of appeal, in discharge of their function to review the evidence, gave an excellent summary of the testimony. 460 So.2d 1166. It agreed with the trial court that the evidence at trial revealed that the accident did not change the plaintiffs pre-existing condition.
As may be observed, the majority made another evaluation of this testimony and reached an independent conclusion as to causation not shared by either court below.
We ought not substitute our opinion for that of the trial judge's when his is amply supported by the record.
I respectfully dissent.