| iPLOTKIN, Judge,
dissenting with written reasons:
Because the majority’s decision declining to consider defendant Tidy Building Services’ argument that the expert testimony forming the basis of the holding in the instant case is legally and procedurally wrong, I respectfully dissent. For the reasons stated below, I would find that Dr. Lipsey’s testimony is inadmissible under the standards established by Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116,1123 (La.1993).
The instant case involves a plaintiffs claim that her husband’s work-related exposure to benoxyethanol, a chemical commonly used as a solvent in numerous household cleaning agents, caused her husband’s death by aplastic anemia.[1] The primary issue is whether expert testimony presented by the plaintiff and relied upon by the hearing officer in deciding this workers’ compensation case was properly admitted under the Daubert/Foret standards.
However, the majority improperly finesses this primary issue by holding that the defendant’s failure to raise the issue of Dr. Lip-sey’s competence to testify at the trial court level precludes this court from considering the issue. I vehemently disagree with this conclusion. Dr. Lipsey’s testimony was presented by 12deposition, which was originally taken for discovery purposes. The defendant had no reason to object to the taking of the deposition because it was merely taken for discovery. Thereafter, as the majority correctly notes, the deposition was admitted at the trial court level without objection from the defendant. However, again the defendant had no reason to object. The trial court’s responsibility to determine the admissibility of the plaintiffs expert testimony under the Daubert/Foret standards is not dependent on the defendant’s objection. The *51 trial court failed in that responsibility, and this court now has the responsibility of determining the admissibility of the evidence on the defendant’s assignment of error on appeal.

Admissibility of Dr. Lipsey’s testimony

The workers’ compensation act is remedial in nature. Pinkins v. Cardinal Wholesale Supply, 619 So.2d 52, 55 (La.1993). Thus, provisions of the workers’ compensation law should be liberally construed in favor of the claimant. Id. Despite such liberal construction, the plaintiff in a workers’ compensation ease bears the burden of establishing a causal connection between injury and a condition of employment by a reasonable preponderance of the evidence in order to recover under the act. See Hammond v. Fidelity & Casualty Co., 419 So.2d 829, 831 (La.1982).
Expert testimony is commonly offered to prove the causal relationship between the disability and the work-related accident in workers’ compensation cases.[2] Such experts generally are not required to determine the exact cause of the disability in order for the employee to recover because of the existence of a rebuttable presumption in favor of the plaintiff. See Hammond v. Fidelity & Casualty Co., 419 So.2d 829, 831 (La.1982). A plaintiff-employee’s disability |8is presumed to have resulted from an accident if the plaintiff-employee was in good health before the work-related accident at work, and the symptoms of the disabling condition appeared and continuously manifested itself from the time of the accident onward, provided the evidence establishes a reasonable possibility of a causal connection between the accident and the disabling condition. Id. This presumption is not conclusive; rather, it compels the defendant to come forward with sufficient contrary evidence to rebut the presumption. Id. Once the plaintiff establishes the presumption of a causal relationship, the party denying the existence of the presumed fact assumes both the burden of producing evidence and the burden of persuasion on the issue. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320, 325 (La. 1985).
In this case, the trial court make the following findings: (1) that the claimant met her burden of establishing the presumption of a causal relationship and (2) that Tidy did not meet it’s burden of proof to overcome the presumption. The trial court based this judgment on the expert testimony of Dr. Lipsey.

Expert scientific testimony

La.C.E. art. 702, which governs testimony by expert witnesses, provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Generally, the determination of whether to qualify a witness as an expert under this article is within the sound discretion of the trial judge. Clement v. Griffin, 91-1664 (La. App. 4 Cir. 3/3/94), 634 So.2d 412, 424. However, under the Daubert/Foret rule governing admissibility of expert testimony, trial judges are required to | consider factors other than whether the purported expert’s testimony is based on methodology subject to “general acceptance” in the scientific community, which allows the admission of some testimony even if the methodology is not “generally accepted.” The scientific evidence, however, must be derived by scientific method. The purpose of the Daubert/Foret test is to prevent the admission of unproven scientific theory from unqualified experts or from qualified experts using improper methods or research techniques; this type of evidence is commonly referred to as “junk science.” Daubert/Foret seeks to prevent the admission of “junk science” evidence.
Under Daubert and Foret, a trial judge is required to consider the following four factors to determine the reliability of the expert’s reasoning or methodology:
*52 1) The “testability” of the expert’s theory or technique.
2) Whether the theory or technique has been subjected to peer review and publication.
3) The known or potential rate of error.
4) Whether the methodology is generally accepted in the scientific community.
Young v. Logue, 94-0585 (La.App. 4 Cir. 5/16/95), 660 So.2d 32, 50. Thus, the proponent of expert testimony cannot simply elicit the expert’s conclusionary testimony, but must elaborate to some extent about the scientific methodology employed to verify the hypothesis. Clement v. Griffin, 634 So.2d 412 (La.App. 4th Cir.1994). The fact that the expert’s testimony does not satisfy one of these four inquiries does not automatically made the testimony inadmissible. Young, 660 So.2d at 50. However, the expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702. State v. Foret, 628 So.2d 1116, 1123 (La.1993).

IsDr. Lipsey’s testimony

At trial, Dr. Lipsey’s deposition was admitted into evidence for perpetuation purposes without any objection by the defendant. Dr. Lipsey stated that toxic poisoning is possible from oral, inhalation, and dermal exposure to butoxyethanol, and that such exposure could cause aplastic anemia, stating as follows:
We have known that benzene, a product that also causes this problem, we have known that benzene can cause bone marrow suppression for almost 100 years now but we don’t know exactly how it exerts its effect other than the formation of new red blood cells. Ten percent of your red blood cells are destroyed every week so over time if you are not building up new ones, then you get aplastic and pancytopenia comes with it later.
But the two theories, one is that the butoxyethanol and the benzene both would attack the cells that would covalently bond at the site where new blood cells would be produced. And another effect is the binding with DNA. So it’s a blood disease that really inhibits the production of new blood cells and the old ones die off.
Deposition, pp. 20-21. Dr. Lipsey also stated that hemorrhaging can be caused by “this chemical,”[3] stating that animals killed by the product often exhibit hemorrhaging in various organs and that “[w]ith rats and mice you see the blood coming out of every orifice.”
Dr. Lipsey testified that butoxyethanol cannot be detected in the tissue or blood of a person, only in the urine; unfortunately, no urine test was performed on Mr. Bryant. Dr. Lipsey did point to information other than the hemorrhaging contained in the autopsy report, including infections, from which he concluded that Mr. Bryant’s death was caused by exposure to butoxyethanol. Dr. Lipsey concluded as follows: “I can’t see any other cause for his bone marrow suppression and sepsis and internal hemorrhaging other than his work-related exposure to 2-butox-yethanol with a high degree of scientific certainty.”
leDr. Lipsey stated that his opinion that high doses of butoxyethanol can cause destruction of red blood cells, kidney damage, and damage to the immune system was based on “scientific literature.” He further stated that “quite a bit” of animal testing had been done concerning the toxicity of butox-yethanol. However, Dr. Lipsey gave no source for his comments that butoxyethanol causes hemorrhaging beyond his statements concerning animal studies, and the effect of “this chemical” on rats and mice. His opinion that butoxyethanol causes hemorrhaging in rats and mice is supported by the Material Safety Data Sheet of January 15, 1993 for the Grease Cutter, which at 7.2 states as follows:
Butoxyethanol penetrates the skin. In rodents, heavy doses damage red blood cells with injury to liver, kidney, and spleen. Humans and other species are more resistant. Can injure eyes.

*53
Dr. George’s testimony

The testimony of the defense expert toxicologist, Dr. William George, professor of Pharmacology and director of Toxicology at the Tulane University School of Medicine, directly contradicted the testimony of Dr. Lipsey. Dr. George stated unequivocally that exposure to butoxyethanol will not cause aplastic anemia in humans, although he admitted that exposure to butoxyethanol does cause aplastic anemia in rodents. The reason for the difference, Dr. George stated, is that rodents convert butoxyethanol to BAA, while humans covert butoxyethanol to a different type of metabolite, a glutamine intermediate, which does not cause hemolysis. Dr. George stated that he reviewed almost 3,000 scientific articles, some on butoxyetha-nol poisoning and some on aplastic anemia, and that not one of the articles indicated a connection between the two. Moreover, Dr. George stated, he was unable to find any connection between butoxyethanol and immune Rdamage. Dr. George cited some of the scientific articles he relied upon in forming his opinion.
Dr. George admitted that butoxyethanol is a “well described irritant,” but said it does not cause aplastic anemia. Further, Dr. George stated, fifty to seventy percent of aplastic anemia cases are idiopathic, which means that the etiology of the disease is unknown. Some of the known causes of the disease are genetic factors and drugs, as well as some chemicals other than butoxyethanol. Dr. George admitted that butoxyethanol is an organic solvent, but disagreed with the pathologist’s statement that Mr. Bryant’s death was probably caused by exposure to an organic compound.

Admissibility of Dr. Lipsey’s testimony

In this case, Dr. Lipsey’s testimony is not admissibly under the Daubert/Foret factors because it does not rise to the necessary threshold level of reliability. In fact, Dr. Lipsey’s deposition contains no information relative to any of the Daubert/Foret factors listed above. Although Dr. Lipsey testified that his conclusions were based on “scientific literature,” no other information about the source of his conclusions was given. Whether the theory is “testable,” whether it had been subjected to peer review, the extent to which the theory might have been published, the known or potential rate of error, and the acceptability of the methodology cannot be determined from the trial court record. Moreover, we note that Dr. Lipsey testified that he based some of his opinion on tests involving exposure of rodents to butoxyetha-nol, which is not necessarily relevant to this ease, which involves alleged exposure to a human. Also important to our determination that Dr. Lipsey’s testimony is unreliable is the fact that Dr. IgGeorge’s testimony was directly contrary to Dr. Lipsey’s testimony concerning vital areas of scientific inquiry.[4]
Because the plaintiff failed to demonstrate that Dr. Lipsey’s testimony was reliable, the trial court’s finding that Dr. Lipsey’s testimony was admissible was incorrect. Without Dr. Lipsey’s testimony, the plaintiff failed to present any evidence to link Mr. Bryant’s death to his employment with defendant Tidy. Thus, the plaintiff failed to carry her burden of proof, and the trial court judgment in favor of the plaintiff should be reversed.

. The record uses two different terms to refer to Mr. Bryant’s illness. In some places, it refers to "aplastic anemia.” In others, the record refers to "primary bone marrow suppression” or simply "bone marrow suppression.” For simplicity's sake, this opinion will consistently use the term "aplastic anemia,” even when the experts used one of the other terms.

. Most workers' compensation cases deal with employee disabilities allegedly arising from work-related accidents. However, the same standards and presumptions apply to the instant case, involving a death allegedly related to a work-related condition.

. When Dr. Lipsey referred to "this chemical” at this point in his deposition testimony, it is impossible to tell for certain that he meant butoxyetha-nol because he was also discussing other chemicals and compounds during the same portion of his testimony.

. Because it is not necessary to determination of this appeal, we do not reach the question of whether Dr. George's testimony was reliable under the Daubert/Foret test. Because Dr. Lipsey's testimony was not reliable, the plaintiff failed to prove the presumption of a causal relationship and the burden never shifted to the defendant to overcome that presumption.