LGREMILLION, Judge.
The plaintiff, Nancy Olander, appeals the judgment of the workers’ compensation judge finding that she failed to prove a causal connection between a fall at home and her prior work-related injury. For the following reasons, we reverse.
FACTS
On May 6, 1996, Olander suffered a work-related injury when she slipped and fell while working as a waitress for the defendant, Schillileagh’s. She suffered injuries to her left side, including her neck, shoulder, lower back, and hip, and was examined over the course of her treatment by at least five different doctors. She was released to a sedentary to light-duty work restriction on April 9,1998, by her treating orthopedic surgeon, Dr. William Andre’ Cenac.
On May 4, 1998, Olander suffered further injury when her left hip gave out causing her to fall down a flight of stairs at home. Olander’s family physician, Dr. James R. Romero, recommended that she *263 seek treatment from the emergency room of the Iberia Medical Center. X-rays revealed a fracture of the superior, anterior aspect of the L4 vertebral body. Olander was placed on pain medication and discharged. She returned to the emergency room the next day complaining of intractable pain in her back and left leg. She was admitted to the hospital by Dr. Harold Hebert; further diagnostic testing revealed the previously mentioned fracture and a small area of disc herniation at the L5-S1 disc level on the left. On September 10, 1998, Dr. Douglas Bernard performed an anterior interbody fusion at the L5-S1 disc level.
DOlander filed a disputed claim for compensation on April 3, 1998, complaining that Schillileagh’s refused to approve surgery needed to correct her condition. Although the record is not clear, this surgery was evidently proposed because Olander was suffering from thoracic outlet syndrome. Olander suffered the fall which is currently at issue after filing her claim. In her August 8, 1998 pre-trial statement, she first mentions that she “has further reinjured herself as a direct result of her continued disability and inability to ambulate” Schillileagh’s denied responsibility for the surgery. Following a hearing on the issue of causation for the subsequent fall and injury, the workers’ compensation judge issued a judgment in favor of Schilli-leagh’s, finding that Olander failed to prove a causal connection between her work-related injury and her May 4, 1998 fall. This appeal followed.
ISSUES
On appeal, Olander raises four assignments of error. She argues that the workers’ compensation judge erred in finding no causal connection between her work-related injury and her subsequent fall at home and in not finding Schillileagh’s responsible for her medical expenses and compensation benefits. She further argues that the workers’ compensation judge erred by not assessing Schillileagh’s with penalties, attorney’s fees, and court costs.
LAW
The aggravation of a prior work-related injury is compensable even though the aggravation occurs away from work and after employment has been terminated. Stewart v. Hospitals Affiliates Int’l, Inc. of Baton Rouge, 404 So.2d 944 (La. 1981). If the work-related injury predisposed the plaintiff to the second injury, lathen a causal connection is found between the two accidents and the plaintiff is entitled to compensation. Kelly v. City of New Orleans, 414 So.2d 770 (La.1982); Lacy v. PPG Indus., Inc., 93-1588 (La. App. 3 Cir. 6/1/94); 640 So.2d 655, unit denied, 94-1703 (La.10/7/94); 644 So.2d 639. Since the findings of fact in a workers’ compensation case are subject to the manifest error — clearly wrong standard of review, they will only be reversed if they are clearly wrong. Ckaisson v. Cajun Bag & Supply Co., 97-1225 (La.3/4/98); 708 So.2d 375.
At the hearing on the merits, Schil-lileagh’s stipulated to the testimony of Karen Young, the claims adjustor handling dander’s file. Young would have testified that Olander’s workers’ compensation benefits were terminated prior to the May 4, 1998 fall, and her claim for the subsequent fall was denied based primarily on Dr. Hebert’s May 6, 1998 report and on subsequent medical reports.
Olander testified that she was originally injured on May 6, 1996, when she slipped on cappuccino at work. As a result, she suffered injuries to her neck, shoulder, lower back, and hip. She testified that she fell on May 4, 1998, when her left hip completely gave out while she was walking down stairs at her home. Olander testified that her hip had given out prior to this fall and that she had reported this to her doctors. She could not recall any other work-related accidents where she might have injured her lower back or left side. With regard to her 1992 examination by *264 Dr. Bernard, she stated that she did not recall that incident. She explained that she had passed out a few times while pregnant because she was anemic.
Following her fall at work, Olander was initially seen by Dr. Cenac, to whom she reported that she had slipped and fallen on her left side. In response to the |4reason for her visit, she indicated that her “left arm is & leg hip.” In his report, Dr. Cenac noted spasm primarily in .Olander’s right paralumbar area and motor weakness, primarily in the left extensor hallucis longus muscle. His impression was that she was suffering from cervical and lumbo-sacral strain. On June 20, 1996, Olander told Dr. Cenac that she had increasing pain in her right leg and gastroc and posterior thigh area, as well as her left upper extremity. Dr. Cenac noted right hip pain with flexion. On July 8, 1996, Olander continued to complain of pain and soreness in her neck and back. Dr. Cenac found spasm in both the paracervical and para-lumbar areas. His impression was that Olander was suffering from cervical and lumbosacral strain. On July 30, 1996, Olander had slightly improved range of motion in her cervical and lumbar spine, with full range of motion at the hip. On August 13, 1996, she had full range of motion in both the cervical and lumbosa-cral spines.
On September 3, 1996, Dr. Cenac’s impression was that Olander had chronic headaches as well as resolving lumbosacral and cervical strain. On September 30, 1996, she had mild diminution in her range of motion of the cervical and lumbosacral spines. On December 2, 1996, Dr. Cenac felt that Olander was suffering from chronic shoulder pain, headaches, and mild lower back pain with left lower extremity numbness and tingling. On January 2, 1997, Olander’s lumbar range of motion was slightly limited secondary to mild pain, especially with the right lateral tilt. She had a negative straight leg raise and mild tightness in the hamstrings.
On February 28, 1997, Olander reported hip pain secondary to mild malreduction after undergoing physical therapy. The examination of her spine and hip showed full range of motion with no significant organic pathology noted. On |fiMarch 25, 1997, Olander exhibited no significant lum-bosacral problems. On May 27, 1997, she had mild tenderness primarily about the lumbosacral junction with slight limitation in forward flexion and extension and lateral tilt. Dr. Cenac’s impression was chronic neck and shoulder pain with a recurrence of mild low back pain. He released her to work status on April 9, 1998.
On September 8,1996, Olander was seen by Dr. Daniel Dunlap, a neurologist, for treatment of her headaches. On her initial visit, she complained, in addition to her headaches, that her left neck, shoulder, hip, and leg would become numb. Dr. Dunlap noted that she experienced low back pain and, especially, left hip pain during straight leg raises, knee-chest, and Patrick’s maneuvers. He further noted that she was mildly tender in the left buttock. On October 16, 1996, Olander reported that she sometimes experienced numbness in her left arm, which would go from her neck and shoulders down into her lower back, more on the left. Dr. Dunlap noted that she was mildly tender over the left paraspinal lumbar muscles. On November 19, 1996, Dr. Dunlap recommended that Olander see Dr. Jimmie Cole, a psychologist, to develop coping skills for her chronic pain. On March 19, 1997, Dr. Dunlap noted that Olander experienced pain in her left buttock and hip during 'straight leg raises, knee-chest, and Patrick’s maneuvers. He further stated that he did not object to Olander returning to work subject to Dr. Cenac’s approval. A handwritten note on that date states that Olander was still having pain in her left arm and leg. It further states that her pelvic joint was locking up and that she was obtaining some relief using a sacral wedge. In his initial report to Dr. Dunlap on January 30, 1997, Dr. Cole reported *265 that Olander felt a popping sensation in her left hip.
IfiDr. Norman Anseman, a specialist in physical medicine and rehabilitation, examined Olander on October 24, 1996, upon referral from Dr. Dunlap. He noted objective findings of giveaway muscle testing in her left leg and increased pain over the flanks in the sitting position. This, he noted, was an element of functional overlay. On November 25, 1996, Olander phoned Dr. Anseman’s office reporting that she had experienced burning pain and numbness in her left leg, and that she had to pull off of the road while driving because of her neck and left leg pain.
Olander was examined by Dr. Jerald Watts, an orthopedic surgeon, on March 25, 1997. At her initial visit, she complained of low back pain radiating into the lower extremities to the level of the thigh on the right and the foot on the left. This pain was associated with numbness and tingling in her lower extremities to the foot, occasionally on the right. Olander complained of left leg pain on weight bearing and that sitting, standing, and forward bending increased her lower back pain. Dr. Watts noted apparent tenderness in the lumbosacral junction and lumbar muscles and mild spasm with forward flexion. The left sitting straight leg raise test caused complaints of slight pain and numbness in the left side of the back, up to the scapula, while the supine straight leg raise test caused subjective complaints of pain. Dr. Watt’s impression was that Olander had subjective complaints of pain in the left lumbar region and numbness of the left leg. He felt that she had a rather severe functional overlay.
On October 29, 1997, Olander complained of left sided lower back pain radiating down into the hip and left leg pain on weight bearing. Her lower back pain was associated with numbness and tingling in the left lower extremity to the level of |7her foot. Her lower back pain was increased with coughing, sneezing, sitting, standing, bending forward, and lying down in certain positions. She further complained that her lower back pain was worse than her hip pain and that weather conditions affected her back condition. Dr. Watts felt that .Olander’s lower back pain had resolved.
Olander was examined by Dr. John Cobb, an orthopedic surgeon, on December 22, 1997, at the request of her workers’ compensation carrier. In the patient information, Olander wrote that she was seeing him because of her left shoulder and hip. She further stated that the most aggravating thing about her pain was that her “hip locks up; shoulder burns w/ constant headaches; left shoulder pops w/ movement of arm causes it to hurt a lot.” In her history taken by the nurse, Olander complained that pain radiated from her left shoulder down into her left hip, and that her hip pops and locks up at times. She further stated that her shoulder pain was greater than her hip pain. In his report, Dr. Cobb noted that Olander’s chief complaint was left shoulder and hip pain. He.stated that she did have pain over the left ilium, but that her left shoulder was her primary concern.
Olander received physical therapy from Thomas J. Landry & Associates, Inc., beginning on June 17, 1996, upon request of Dr. Cenac. At her initial visit, Olander complained that weight bearing on her left leg caused it to give out. On June 25, 1996, she complained of charley horses in her left hip/buttock.
Olander also received physical therapy from Boulet Rehabilitation Services. On February 17, 1997, the physical therapist reported that Olander felt a pop around her left neck and shoulder three weeks previously and had experienced Ran increase in pain near her upper spine and an increase in the severity of her headaches. Since then, she had experienced charley horses in her left hip and pain in her lower back. She further reported that she had difficulty lying on her left side. On February 21,1997, Olander complained of pain in *266 her left hip, buttock, and lower back, which was nearly as bad as her left neck and shoulder pain. Her left hip was treated with Mulligan techniques to increase flex-ion and internal rotation. On February 28, 1997, Olander mainly complained of burning pain into her left upper quarter and intermittent pain into her lower back. The physical therapist treated her with deep tissue work to the left hip, low back, shoulder, and neck, followed by strain/counter strain techniques to calm her left neck and shoulder pain. On March 3, 1997, Olander complained of soreness in her left buttock and hip.
On March 6, 1997, she stated that her left-sided pain was the worst ever, and that her leg had given out on her that day. The physical therapist treated Olander with ultrasound throughout the mid and low back and then worked with her on prone press-ups to decrease the left leg pain. Olander continued complaining of a pinching sensation in her left sacroiliac region, so the physical therapist turned her over supine with her knees bent and worked on a sacral release. She was able to palpate a release, and retesting of the sacroiliac motion bilaterally revealed that the joint had gone from locked bilaterally to mobile bilaterally. The physical therapist instructed Olander in the use of a sacral wedge. On March 12,1997, Olander complained of episodes of pain down to her toes on the left leg and that use of the sacral wedge was uncomfortable. The physical therapist treated her with moist heat, electric stimulation, and massage and then worked extensively on mobilization techniques hover the sacral wedge and with prone press-ups to eliminate her leg symptoms. Olander’s symptoms were proximalized to the hip following treatment.
On March 14, 1997, Olander complained of left arm and leg pain, with symptoms all the way to the fingertips and toes. The physical therapist treated her with moist heat, electric stimulation, and massage. The leg symptoms were proximalized to the left hip through prone press-ups. On March 18, 1997, Olander complained of pain down the entirety of her left arm and leg. The physical therapist worked on a three-step lumbar mobilization procedure to increase Olander’s left straight leg raise. She continued to complain of left arm and leg pain on March 19, 1997. The physical therapist elicited tenderness along the iliac crest on the left and palpable muscle spasm in the left iliopsoas muscle. She treated Olander with neuromuscular techniques to reduce the pinpoint tension in the left iliopsoas muscle and gentle soft tissue stretching in the bilateral hip girdles. The physical therapist reported a notable reduction in the tension of the left iliopsoas muscle following treatment.
On March 24, 1997, Olander complained of neck, back, left arm, and left leg pain over the weekend. The physical therapist alleviated all leg pain by positioning her prone and doing manual mobilizations to the L4-5, L5-S1 disc levels while Olander flexed her left leg maximally. The physical therapist sent letters to Drs. Watts and Cenac on March 24th, reporting on Olan-der’s progress. She further described Olander’s sacroiliac joints locking up during treatment and the therapy applied to provide a release.
|inThe day after her May 4, 1998 fall, Olander told Dr. Romero that her left hip gave out causing her to fall. Dr. Romero recommended that she go to the emergency room. Olander went to the Iberia Medical Center Emergency Room, where x-rays revealed a fracture of the L4 vertebra. She was placed on medication and released. She returned to the emergency room the next day complaining of severe pain in her back and left leg and was admitted to the hospital by Dr. Hebert. Olander underwent further diagnostic testing, which revealed the fracture and a small area of disc herniation at the L5-S1 disc level on the left. After discharge, Olander continued treatment with Dr. Hebert, who later diagnosed her as suffering from symptomatic spondylolysis at L5-S1. *267 A September 17, 1998 MRI revealed an asymmetric left-sided bulge of the L5-S1 disc, with no central canal stenosis. The bulge had improved since a May 19, 1994 CT scan. On September 10, 1998, Dr. Bernard performed an anterior inner body fusion using a BAK cage technique. On December 1, 1998, Olander reported to Dr. Romero that her left hip gave out, causing her to fall off her porch and onto her left side. She reported this same information to Dr. Bernard on December 3,1998.
Dr. Bernard’s records include an examination he performed on Olander on June 11, 1992, after she passed out and fell while working as a waitress at the Golden Corral. Olander, who was nineteen at the time, stated that she passed out because she was three and one-half months pregnant and that she had passed out once before after cutting her finger. During the examination, she complained of numbness in her right ear, left arm, upper back, and left side, if she laid on it for any length of time. She complained of pain in her lower back, left sacroiliac region, and up and ludown the thoracic spine on the left. After examining Olander and reviewing her x-rays, Dr. Bernard found nothing wrong. He reported that there was no reason she could not work, except that he was concerned about her passing out.
After reviewing the record in its entirety, we find that the workers’ compensation judge was clearly wrong in finding no causal connection between Olander’s work-related injury and her subsequent fall at home. The evidence documents that Olan-der consistently complained of pain in her left side, consisting of leg and hip pain and numbness, her hip locking up, and her leg giving out. The fact that her hip locked up was documented by Boulet Rehabilitation Services on March 6, 1997, when the physical therapist reported that Olander’s sacroiliac joints had locked bilaterally. A report documenting this occurrence was sent to both Drs. Cenac and Watts. Dr. Cobb’s record of December 22, 1997, further documents that Olander complained of her hips locking up.
Moreover, we do not find Dr. Hebert’s May 6, 1998 report conclusive as to the cause of her fall. In his report, Dr. Hebert states: “She has some other history, long, involved history of a problem with her left upper extremity that has been cared for by Dr. Andre Cenac; but that has, from what I can understand, absolutely nothing to do with her present problem. The present problem started two days ago.” Although Olander’s prior fall may not have been the medical cause of her subsequent injury, we do find that it was the legal cause of that injury. Medical cause and legal cause have two different meanings. In Hammond v. Fidelity & Casualty Co. of New York, 419 So.2d 829, 832-33 (La.1982), the supreme court discussed the difference between these two terms:
|iaWhen the doctors speak of cause they are essentially speaking of etiology — the origin of disease; what initially causes a disease. When courts and lawyers speak of cause they are concerned with the question of whether the particular incident in question contributed to the plaintiffs disability by making manifest symptoms previously unnoticed. “Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the court, based on all the credible evidence.” Haughton v. Fireman’s Fund American Insurance Companies, 355 So.2d 927, 928 (La.1978).
Finally, we find no evidence establishing a causal connection between Olan-der passing out and falling at work in 1992 and her May 4, 1998 fall. Olander told Dr. Bernard that she passed out because she was pregnant and that she previously passed out after cutting her finger. At the hearing, she testified that she passed out because she was anemic during her pregnancy. The record is void of evidence revealing that Olander suffered any aftereffects from this fall. In fact, Dr. Ber *268 nard’s report states that she suffered no injuries as a result of the 1992 incident. The only anomaly is the reference to the 1994 CT scan. Rather, the evidence preponderates in favor of finding a causal connection between the May 6, 1996 fall and Olander’s subsequent fall. An employee’s disability is presumed to have resulted from the work-related accident if:
[Bjefore the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing ... that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and the disabling condition....
Walton v. Normandy Village Homes Assoc., Inc., 475 So.2d 320, 324 (La.1985).
There is no evidence that Olander suffered any problems with her left hip prior to the May 6,1996 accident. However, problems with her hip continuously manifested themselves after the accident, and the medical evidence reveals a | ^reasonable possibility of a causal connection between the May 6, 1996 accident and her subsequent condition. We find that the injuries Olander suffered in her 1996 work-related fall predisposed her to fall again, thus, the injuries suffered in the May 4, 1998 fall are an aggravation of her work-related injuries and are compensable. Accordingly, Schillileagh’s is responsible for her medical expenses resulting from that fall and workers’ compensation benefits. However, we do not find that Schilli-leagh’s acted arbitrarily or capriciously in contesting Olander’s claim for compensation, thus, we affirm the judgment insofar as it denied penalties and attorney’s fees.
CONCLUSION
For the forgoing reasons, the judgment of the workers’ compensation judge is reversed and set aside. It is now ordered, adjudged, and decreed that there be judgment in favor of the plaintiff-appellant, Nancy Olander, and against the defendant-appellee, Schillileagh’s, finding a causal connection between her work-related injury and her subsequent fall and resulting injury and that Schillileagh’s is responsible for her medical expenses and workers’ compensation benefits. Accordingly, the matter is remanded to the Office of Workers’ Compensation for a determination of benefits. Additionally, the judgment is affirmed insofar as it denied penalties and attorney’s fees. Court costs and the costs of this appeal are assessed to Schilli-leagh’s.
AFFIRMED IN PART; REVERSED IN PART; RENDERED; AND REMANDED.
WOODARD, J., CONCURS.