771 So.2d 751 (2000)
Randall MARKS
v.
84 LUMBER COMPANY.
No. 00-00322-WCA.
Court of Appeal of Louisiana, Third Circuit.
October 11, 2000.
*753 Allen M. Babineaux, Lafayette, Hugh B. Exnicios, Jr., Exnicios Legal Center, Folsom, Fernand Louis Laudumiey, III, Howard, Laudumiey, Mann, New Orleans, Counsel for Randall Marks.
Lawrence Bernard Frieman, Juge, Napolitano, Leyva, Metairie, Counsel for 84 Lumber Company.
(Court composed of Hon. HENRY L. YELVERTON, Hon. SYLVIA R. COOKS, and Hon. MICHAEL G. SULLIVAN, JJ.)
YELVERTON, Judge.
Both the claimant and the employer, together with its workers' compensation insurer, appeal the judgment of the workers' compensation court in this difficult and complex case. For reasons hereafter explained, we affirm.
Randall Marks, then 31, suffered a mild brain injury on April 16, 1992, while he was employed as manager of the 84 Lumber Company store in Lafayette. He was attempting to load some lumber on a forklift. It is uncertain how the accident happened because Marks was loading the lumber by himself and does not remember any details. It is believed that he got hit on the head with a board. Marks' fellow employee, who was working the front of the store at the time, came to look for him and found him in a confused state and vomiting. His parents were called, and they took him to the hospital.
According to the hospital records, Marks was alert and oriented when he got there, but he had a severe headache and blurred vision. A red area was present on his left shoulder extending to the upper arm. There was also an area on his right groin that required a band aid. No discolorations or abrasions were noted on his head. Marks was admitted for observation overnight and was discharged the next day. Marks continued with symptoms of headaches, memory loss, and easy fatigability, in addition to neck, back, and leg pain.
Several months later, around August 1992, Marks began experiencing fainting spells, which in medical terms are known as "syncopal episodes." These spells increased in frequency until he was experiencing 15 to 18 of them a day by the time of the trial of this case in 1999. Marks fell on his head so much that sometimes he required stitches, and it got to the point that his doctors suggested he wear a helmet to protect his head. The majority of the testimony during the eight-day trial focused on the cause of these syncopal episodes.
When the accident happened, Marks had been married for over ten years, he and his wife had two children and he had been employed for eight years, as manager for the last three, at his employer's store. After the accident, he has not worked at all. He has lost his wife, custody of his children, his home, and, according to most doctors testifying, his self-esteem. The employer has paid benefits and all medical expenses (except for an occipital neurectomy in 1996).
In detailed and well-analyzed reasons for judgment, the workers' compensation judge found that "Marks had consciously and deliberately produced the large majority of his symptoms, specifically including the syncopal spells." However, the trial judge believed that Marks had proved by clear and convincing evidence that he was suffering from a depression caused by the accident at work, which rendered him temporarily, totally disabled, and the court awarded benefits. The court found that he was not feigning the depression. The disability finding is appealed by 84 Lumber and its workers' compensation insurer, Kemper Insurance Company. 84 Lumber and Kemper additionally appeal a ruling by the workers' compensation judge that neither Marks nor his parents committed fraud to obtain benefits in violation of Louisiana Revised Statute 23:1208.

*754 STANDARD OF REVIEW
Factual findings in worker's compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. "Thus, `if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'"
Chaisson v. Cajun Bag & Supply Co., 97-1225, pp. 8-9 (La.3/4/98); 708 So.2d 375, 380-81 (alteration in original) (citations omitted) (quoting Seal v. Gaylord Container Corp., 97-0688, p. 5 (La.12/2/97); 704 So.2d 1161, 1164 (quoting Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990))).

PERMANENT AND TOTAL DISABILITY
An impressive number of medical experts, including several who treated Marks from the injury until trial, believed Marks' syncopal episodes were real. So did virtually all of the many lay witnesses which included therapists and nurses. Marks claims the trial court erred in not finding him permanently and totally disabled. He argues that the trial court was clearly wrong in finding that his syncopal episodes were conscious and deliberate feignings and in not authorizing the continuance of medical attendants and therapy.
"An employee in a worker's compensation action has the burden of establishing a causal link between the work-related accident and the subsequent disabling condition." Miller v. Roger Miller Sand, Inc., 94-1151, p. 6 (La.11/30/94); 646 So.2d 330, 334. An employee's disability is presumed to have resulted from the accident if before the accident, the injured employee was in good health, but commencing with the accident, symptoms of the disabling condition appeared and continuously manifested themselves afterwards. Walton v. Normandy Village Homes Ass'n, Inc., 475 So.2d 320 (La. 1985). However, the presumption requires either that there is sufficient medical evidence to show there to be a reasonable possibility of causal connection between the accident and disabling condition, or that the nature of the accident, when combined with the other facts of the case, raises a natural inference through human experience of such a causal connection. Id.
None of the doctors who testified appear to dispute that Marks suffered a mild brain injury as a result of the accident. There also does not appear to be any doubt that the propensity to have these syncopal episodes makes Marks unemployable. The issue is whether these syncopal episodes were caused by his work-related injury or by something else.
Dr. James Domingue was the neurologist who treated Marks on the day of his accident and continued treating him for five years until July of 1997. Although Marks' mother testified that he began fainting about two to three weeks after the accident, there is no documentation in the medical records that he experienced syncopal episodes before August 1992. Dr. Domingue testified that Marks was initially fainting once or twice a week but that the episodes increased to around 15 times a day. The certified nursing assistants staying with Marks around the clock documented an astonishing 24,265 syncopal episodes from 1995 to 1999.
Most of the experts agreed that the symptoms associated with a mild brain injury improve with time and usually resolve within three to six months. Marks' case was a troubling one to all the experts *755 because his symptoms escalated instead of getting better, the falls even resulting at times in bruising on his head and cuts to his face.
Years of testing revealed no answers as to the cause of the episodes. At one point it was thought that he may have had hyperbeta-adrenergic syndrome, a cardiovascular problem in which an individual responds to increased production of catecholamines causing his heart rate to beat faster than in a normal person and causing him to pass out. Catecholamines are produced by stress, anxiety, and excitement. The test to diagnose this disorder is a tilt table test. The tilt table test performed on Marks was positive when artificial stimulation was used. However, in September 1992, Dr. Domingue prescribed beta blockers and support hose for Marks, which should have eliminated the syncopal episodes if he had hyperbeta-adrenergic syndrome, and they were not eliminated; he continued to have them.
In late 1992, an EEG was performed during which Marks suffered two blackouts. No changes in the EEG were noted during the blackouts indicating he was not having epileptic seizures. A CT brain scan and MRI did not reveal any abnormalities either. Other tests were also administered including a Holter Monitor evaluation, a full field visual screening test, a cerebral SPECT scan, and an auditory evoked response study, all of which were normal.
In late 1993, Marks attended a three-and-a-half week stay in Houston at Del Oro Institute for Rehabilitation. While at Del Oro, Marks' syncopal episodes decreased to one or two a day, but increased again once he came home. In a Valiumassisted interview, the doctor at Del Oro did not observe any malingering. The doctor opined that the symptoms seemed to manifest in a conversional manner in his syncopal spells. It was recommended upon discharge that therapeutic efforts focus on a re-entry into his family and vocational activities. The doctor further recommended that Marks be returned to work as soon as possible.
Neuropsychological testing was also conducted on Marks. Dr. Lynn Aurich first tested Marks in June 1992 on the referral of Dr. Domingue. His testing revealed moderate organic brain impairment. This was not long after the accident, and at that time, Marks was not having the syncopal episodes.
Dr. John Bolter, Dr. F.T. Friedberg, and Dr. Kevin Bianchini also performed neuropsychological testing evaluations on Marks in 1993, 1995, and 1998, respectively. Dr. Bolter's report of the testing in 1993 stated that "it is not unusual for mild to moderate head injured patients to manifest somatic problems and cognitive deficits that seem to abate over time, the pattern that Mr. Marks is now presenting is one of further decline." Dr. Bolter then states "[t]he results further raise serious questions about his efforts on tasks such as the MDMT and imply a deliberate attempt on his part to make himself look more impaired than he actually may be." Dr. Bolter was convinced that "Marks' psychopathology is actually contributing to the bulk of the clinical picture that we are witnessing." Dr. Bolter observed that it was difficult to explain all of the deficits that Marks was manifesting.
In 1995, Dr. Friedberg agreed with most doctors that Marks "has been and remains an extreme complex psychological and organic puzzle." He found that the performance on tests in 1995 was not suggestive of organic involvement, but might represent a complex psychological disorder. He too observed that "[a]ccording to the current evaluation there has been a general deterioration in his functioning that would suggest that there are strong psychogenic factors operating in his present dysfunction."
Dr. Bianchini reviewed the medical records of Marks in 1997. He noted that Marks' scores on certain tests were much *756 lower than would be expected even with brain damage. He also observed that some of the results on forced choice tests revealed that Marks was deliberately producing incorrect responses and thus deliberately feigning impairment.
In reviewing the medical records, Dr. Bianchini also reviewed the records of Dr. Howard Katz, a physical medicine rehabilitation specialist; Dr. Carlton Stanley, a psychologist; and Dr. Michael Howard, a neuropsychologist, all of whom evaluated Marks in 1998. None of these three doctors thought that Marks was faking the syncopal episodes. Both Drs. Katz and Stanley testified that some people with even mild brain injuries had severe problems rather than improving as did the majority of people. They believed that Marks was one of those people who did not improve. Dr. Katz was impressed by the fact that Marks fell so hard on his face when he fainted in his office. Dr. Stanley remarked that he had never heard of someone who is faking keeling over on their face until they concuss themselves and develop bony ridges on their forehead. However, neither doctor could offer an explanation that had not already been explored as to the cause of Marks' syncopal episodes. They simply could not bring themselves to believe that he was faking.
Dr. Howard evaluated Marks when he was admitted to the Tangram Reedville Rehabilitation Program for fourteen days. Dr. Howard commented that Marks' observed falls with no attempt to break the fall or stop hitting his head was unusual in an individual who was deliberately faking such episodes. However, Dr. Howard recognized that it was not possible to determine with any degree of scientific certainty, based on his evaluation, whether or not the syncopal episodes were deliberate.
Marks' symptoms over time have varied. Initially he reported dizziness, blurred vision, photophobia, vomiting, headache, short term memory loss, neck pain and left arm pain. He then began noticing pain in his legs and feet. Later he developed jaw pain, testicular pain, and right ear pain. Marks eventually had lower back surgery and developed bladder problems. He now self-catheterizes himself. He also had an occipital neurectomy procedure in which nerves in his head were cut to stop the headaches. This procedure alleviated the posterior headaches but he continued to have temporal and retro-orbital headaches.
Dr. Donald Adams, an expert in neurology with extensive experience in brain injury rehabilitation, agreed after reviewing the medical records, that there was no organic brain damage. He testified that Marks' neurologic deficits changed over time when they should have gotten better.
Dr. Rennie Culver, an expert in the field of psychiatry with expertise by practice in forensic psychiatry, testified that Marks passed out on October 30, 1996 while he was examining him. Dr. Culver tried to manually open Marks' eyes but Marks kept them squinted shut. Dr. Domingue testified that he also could not open Marks' eyes when he fainted in his office. This, according to the doctors, was a sign that the person was not unconscious, explaining that when a person passes out, there is no eye-muscle control.
Marks also blacked out on two occasions in early 1994 while driving. One time he hit a parked car. The other time his child was in the car with him and he ran in a ditch. In his records, Dr. Domingue noted that no one was injured on either occasion. Marks did not drive any more after that.
In her written reasons for judgment, the trial judge carefully narrated the medical history in stages: the first six months, then the period from November 1992 through October 1995, the time from November 1995 through November 1997, and finally the period after November 1997, which was essentially for trial preparation. She covered the medical history in more detail than we have done here. After studying the record and her reasons for judgment, we are convinced that her conclusion that Marks failed to prove a physiological *757 basis for his syncopal episodes is correct.
In brief Marks argues that even if these syncopal episodes are psychogenic in nature, the accident is nevertheless what caused them. The trial judge disagreed, and so do we.
Where mental injury or illness develops secondary to physical injury sustained in a work-related accident, a claimant is entitled to workers' compensation benefits for any disability resulting from the mental injury or illness and to reimbursement for mental treatment medical expenses. Charles v. South Cent. Industries, 96-0883 (La.11/25/96); 683 So.2d 706. In order to obtain compensation benefits for a mental injury caused by a physical injury, the claimant must prove by clear and convincing evidence that the physical injury caused the mental injury, the mental injury must be diagnosed by a licensed psychiatrist or psychologist, and the diagnosis must meet the most current criteria established by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. Id. citing La.R.S. 23:1021(7)(c) and (d) and Howell v. Service Merchandise Co., Inc., 95-79, p. 5 (La.App. 3 Cir. 8/9/95); 663 So.2d 96, 99. Furthermore, "`[R]eviewing courts must analyze claimed disability caused by mental conditions with utmost caution in view of the nebulous characteristics of mental conditions and the possibility of symptoms being easily feigned.'" Id. at 709 (alteration in original) (quoting Westley v. Land & Offshore, 523 So.2d 812, 813 (La.1988)). "To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, much more probable than its nonexistence." Malbrue v. St. Landry Parish School Bd., 95-1426, p. 3 (La.App. 3 Cir. 4/24/96); 673 So.2d 1157, 1160.
Several possible psychological disorders were offered as explanations for Marks' syncopal episodes. They include a factitious disorder, a conversion disorder, and malingering. A factitious disorder is defined in 18 Taber's Cyclopedic Medical Dictionary 559 (1997) as "[a] disorder that is not real, genuine, or natural. The symptoms, physical and psychological, are produced by the individual and are under voluntary control. These symptoms and the behavior are used to pursue a goal (i.e. to assume the role of patient and to stay in a hospital)." The doctors in this case testified that factitious disorder is similar to malingering but the motivation is different. Malingering differs from a factitious disorder in that it has an external discernable purpose, like the pursuit of money. In a conversion disorder, unlike a factitious disorder or malingering, the symptoms are not intentionally produced. Conversion disordered patients do not know that they are faking the illness.
Dr. Aurich, Dr. Jimmie Cole, a clinical psychologist, and Dr. David Dawes, a psychiatrist, all testified that they did not believe that Marks was faking the syncopal episodes. Drs. Katz, Stanley, and Howard also believed that Marks was not faking his fainting spells. Therefore, none of these doctors diagnosed him with any psychological problem that was causing these fainting spells.
Dr. William Cloyd, a psychiatrist who treated Marks from August of 1994 until his retirement in early 1997, testified that he had a hard time understanding the severity of Marks' response considering the relative lack of severity of the injury. He did not believe that Marks had any organic brain damage. Although he first thought it was a conversion disorder he later changed his mind and said the syncopal spells were manifestations of a factitious disorder.
Dr. Culver diagnosed Marks with a primary diagnosis of factitious disorder with predominantly physical signs and symptoms and a secondary diagnosis of malingering. He stated that the factitious disorder was not related to the head injury in 1992. Additionally, both Dr. Bolter and *758 Dr. Friedberg diagnosed Marks with factitious disorder or malingering.
After testing in 1998, Dr. Bianchini diagnosed Marks with malingering, factitious disorder, and cognitive disorder not otherwise specified. His diagnoses included a whole assessment of medical records, interviews with Marks and his parents, and the testing. Dr. Bianchini was the only person whose prime diagnosis was malingering.
Even after treating Marks for many years since he was injured, Dr. Domingue finally concluded that "the evidence is overwhelming that he has a factitious disorder and that he is genuinely trying to mislead examiners." He reasoned to this conclusion because there was no clear objective documentation of organic pathology, the testing of his cognitive and intellectual functions had shown a decline over repetitive testing which was totally opposite of what was expected in a closed-head injury, and the tests indicated that Marks was actively trying to mislead.
The doctors at Del Oro thought that Marks was not purposefully producing symptoms but was suffering from a conversional disorder. They related the disorder to both the stress at work and at home after the accident.
The workers' compensation judge after hearing and reviewing all the evidence and visually observing Marks concluded that Marks consciously and deliberately produced the syncopal episodes since there was no logical explanation offered to prove otherwise. While it is true that Marks' co-workers, family, and friends testified that he was always a hard worker and upstanding person with no problems, we find that the workers' compensation judge was not clearly wrong in her conclusion. Based on the medical evidence and common sense, Marks was either truly experiencing syncopal spells or he was purposefully producing them. As stated by the workers' compensation judge, "In sum, those doctors who reached the opinion of conscious production of symptoms were able to point to a number of documented reasons for their opinions. Those doctors unwilling to reach that opinion had to ignore the evidence, and were unable to arrive at a persuasive explanation for the complaints." Unable to find clear error in the trial court's evaluation of the evidence, both lay and expert, we conclude that Marks failed to prove by clear and convincing evidence that the syncopal episodes were caused by the accident.

TEMPORARY TOTAL DISABILITY
The workers' compensation judge found that the great weight of the evidence supported a finding that Marks is temporarily, totally disabled due to depression. 84 Lumber and Kemper argue that Marks' depression was caused by his own intentional and purposeful actions in producing the syncopal episodes.
Depression is a mental disorder which is compensable under the Louisiana Workers' Compensation Laws when caused by an accident. Lewis v. Beauregard Memorial Hosp., 94-318 (La.App. 3 Cir. 11/2/94); 649 So.2d 655. However, Marks had to prove by clear and convincing evidence that his depression was caused by the accident. La.R.S. 23:1021(7)(c).
The workers' compensation judge relied on the testimony of Dr. Cloyd, Dr. Dawes, and Dr. Cole in awarding temporary total disability benefits as a result of depression. Believing that Marks was not faking his depression, the workers' compensation judge found he proved by clear and convincing evidence his entitlement to these benefits. We agree.
As the trial judge stated, nearly every expert found Marks to be depressed. Dr. Domingue saw Marks on April 20, 1992, four days after the accident, and diagnosed depression on the next visit on May 15. The doctors who testified either in person or by deposition who noted depression were Drs. Dawes, Domingue, Cole, Stanley and Cloyd. Of these, all except Stanley *759 were treating doctors. The trial judge was particularly convinced by the opinions of Drs. Cloyd and Dawes, treating psychiatrists, and Dr. Cole, a clinical psychologist who treated Marks for seven years. Dr. Cole testified that the major depression was separate from the brain syndrome and the physical issues arising from that. He called it an extreme depression. He testified according to the DSM criteria.
Dr. Cloyd, a psychiatrist, treated Marks after he was referred by Dr. Domingue until his retirement in 1997. He believed that Marks had a major depression on top of everything else. He was unsure as to whether his initial impression of a conversion disorder was correct, in favor of the finding instead of a factitious disorder, after he had looked at the other records of other doctors, but their opinions did not shake his belief that the depression existed, and that it was caused by the injury at the job site on April 16, 1992. He connected the depression to the work accident and treated it as a separate diagnosis.
When Dr. Cloyd retired, Dr. David Dawes, another psychiatrist, took over treatment. His initial observation when he first saw the patient in late 1996, was depression secondary to a head injury. That remained his opinion. He, too, went over the DSM criteria which he testified supported a finding of a major depression, which he felt was a direct result of the accident of April 16, 1992. Dr. Dawes also distinguished between the syncopal episodes and the major depression.
The defendants asked us to find manifest error in the trial court's reliance on the testimony of Drs. Dawes and Cole. Their argument is that these experts, notwithstanding that they were treating physicians, were virtually disqualified as least likely to give an accurate assessment of the plaintiff in the medical-legal setting because of their roles as treating psychotherapists. According to the defendants' argument, these experts were unable to diagnose malingering, and the trial judge was wrong to rely on their opinions regarding depression and its relationship to the work accident. In support of these arguments, the defendants relied upon an article which they introduced in evidence, Larry H. Strasburger, M.D., Thomas G. Gutheil, M.D., and Archie Brodsky, B.A., On Wearing Two Hats: Role Conflict in Sewing as Both Psychotherapists and Expert Witness, 154:4 American Journal of Psychiatry 448 (1997).
In our opinion this article, while it questions whether the treating therapist is the right person to perform a forensic evaluation, warns more of ethical conflict and legal liability of the clinician/evaluator than it does of the risk of inaccuracy in testimony. The trial judge was fully aware of this article when she made her evaluations of the reliability of the testimony of these doctors. She believed that they accurately described Marks' condition, and we find no basis on which to find error in that evaluation. We affirm the trial court's conclusion that Marks proved by clear and convincing evidence that his depression was caused by the accident.

FORFEITURE OF BENEFITS
In the lower court 84 Lumber and Kemper urged the application of Louisiana Revised Statute 23:1208 against Marks and his parents. Section 23:1208 provides for the forfeiture of benefits when a person, on his own behalf or on behalf of another, willfully makes a false statement or representation. 84 Lumber and Kemper claims that Marks violated Section 23:1208 on two grounds, purposefully producing his symptoms and failing to disclose a hospital admission in 1980 on his answers to interrogatories.
Marks was admitted to Opelousas General Hospital in 1980 complaining of dizziness, nausea, and weakness. No problem was found. 84 Lumber and Kemper argue that this hospital admission was significant because Marks complained of the same symptoms following his 1992 accident. We note that this admission was *760 12 years before the current accident. There was also no accident involved in the previous admission. Furthermore, when reminded of the 1980 hospital admission, Marks did not deny it but stated that he had forgotten about it. We do not see this as a willful misrepresentation.
While not deciding specifically the nature of Marks' syncopal episodes, whether it was malingering, a factitious disorder, or both, the workers' compensation judge found that the required intent to obtain benefits was not present. We agree. Testimony from the doctors indicated that the intent to get some monetary gain might be the reason for the purposeful production of symptoms, but that it also could have been to get attention and the need to play the patient. None of the doctors could clearly express what Marks' motivation was. We find no manifest error in the finding that Marks was not guilty of Section 1208 fraud.
84 Lumber and Kemper also argue that Marks' parents violated Section 23:1208(B) because they admitted that they went to Marks' ex-wife before trial and asked her to change her statement pertaining to Marks' blackouts, to the effect that the blackouts did not start until her then husband acquired knowledge that blackouts were possible side effects of head injuries. 84 Lumber and Kemper argue that the parents violated Section 1208 by aiding and abetting Marks. We decline to adopt this argument.
First, we note that there must be a false statement or misrepresentation and there was not. Jones v. Trendsetter Production Co., Inc., 97-299 (La.App. 3 Cir. 2/25/98); 707 So.2d 1341, writ denied, 98-0793 (La.5/15/98); 719 So.2d 463. Marks' ex-wife did not change her statement. Furthermore, we agree with the workers' compensation judge's finding that the parents were not attempting to gain benefits for their son but were merely defending his reputation and their belief in his sincerity in what must have been a very difficult situation for them. We agree that a violation of Section 1208 by Marks' parents has not been proven in this case.
The judgment of the Office of Workers' Compensation is affirmed. Costs of this appeal are assessed to 84 Lumber and its insurer.
AFFIRMED.