I .WHIPPLE, J.
Defendant, Deal’s Carpet Care, appeals from a judgment of the Office of Workers’ Compensation in favor of William Brown, awarding him medical expenses incurred as a result of a detached retina. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On October 10, 2000, William Brown, who was employed by Deal’s Carpet Care as a carpet technician, was performing a “pet treatment” in an apartment unit. To accomplish this task, Brown was using a two-gallon pump sprayer containing Clorox, citric cleaner and water. As Brown was pumping the sprayer to pressurize the contents, the seal around the cap of the spray container failed, causing the contents of the sprayer to shoot upward through the cap, striking him in the face and eyes.
*764 Immediately after the accident, Brown began experiencing burning in his eyes and, thus, flushed his face and eyes with water. Brown then radioed for assistance, and, shortly thereafter, Chip Deal, Brown’s supervisor, arrived at the apartment complex and assisted him in completing the job. Brown then reported back to the office to continue cleaning himself up. At the office, he related what had occurred to Mr. Deal, and Mr. Deal then told him to take the afternoon off.
For a period of a few days to a week following the accident, Brown continued to have a burning sensation in his eyes. He also noted some fuzziness in his vision. Brown assumed that these symptoms were caused by residual chemicals on his contact lenses, and, thus, he repeatedly cleaned his contacts in an attempt to clear up these problems. By December, Brown began to notice that he could not see his nose out of his right eye and instead could only see a black area. Again, Brown believed this was a contact-|relateds problem. However, he did not purchase a new pair of contacts or see an eye doctor at that time for financial reasons.
By January of 2001, the area to the left side of Brown’s right eye where he was experiencing loss of peripheral vision had widened, and Brown was also starting to have problems with depth perception and reduced vision in low light. Thus, when Brown subsequently lost his right contact lens in early February 2001, he made an appointment with Dr. Lawrence Aderhold, an optometrist, to obtain new contacts and also to determine the cause of the problems he was experiencing with his vision.[1]
When Dr. Aderhold examined Brown on February 6, 2001, he diagnosed Brown as suffering from a detached retina of the right eye. The following day, Brown was examined by Dr. John Couvillion, an ophthalmologist, who recommended surgery to repair the retinal detachment. According to Brown, he contacted both Mr. and Mrs. Deal of Deal’s Carpet Care in an attempt to have the surgery approved; however, they both hung up on him and would not give him any information about the company’s insurance carrier.
Thereafter, on February 12, 2001, Brown underwent a double surgical procedure that combined a sceleral buckle and vitrectomy to repair the retinal detachment, which was performed at Tulane Medical Center by Dr. Douglas Babel, an ophthalmologist. In July 2001, Brown developed a second retinal detachment because of scar tissue that had developed during recovery from surgery. Thus, on July 18, 2001, he underwent a second surgical procedure to correct the detachment.
^Subsequent to the second surgery, Brown filed a disputed claim for compensation, seeking reimbursement of the medical expenses he had incurred as a result of the retinal detachment. Following a hearing, the workers’ compensation judge found as a fact that Brown had a preexisting degenerative condition of the eye that was asymptomatic before the accident, but that became symptomatic shortly after the accident. Thus, the workers’ compensation judge concluded that, pursuant to Peveto v. WHC Contractors, 93-1402, p. 2 (La.1/14/94), 630 So.2d 689, 691, Brown was entitled to a legal presumption that the retinal detachment was causally related to the work accident.
With regard to the employer’s burden of overcoming the presumption, the workers’ compensation judge described the burden *765 as “very difficult” and “phenomenal” and stated that it was a “very heightened burden of proof.” The workers’ compensation judge further interpreted Peveto as holding that the burden placed on the employer required the employer to establish that there was “absolutely no correlation” between the accident and the employee’s condition or that such a causal connection was “impossible.” The workers’ compensation judge thus concluded that if there.were “even a remote possibility” of causation, the employer would not be able to overcome the presumption of causation. She additionally stated as follows: “So, I mean, I have to tell you, I think that unless the medical field is completely just adamant that it’s impossible to have any connection, I’m stuck with that jurisprudence [Peveto ] unless the Supreme Court can enlighten me better on it.”
Thus, the workers’ compensation judge concluded that, given the opinion of Brown’s treating physician, there was a “reasonably good possibility” of causation, Deal’s Carpet Care was unable to overcome the | spresumption of causation. Accordingly, she rendered judgment in favor of Brown, awarding him medical expenses related to the retinal tear.
From this judgment, Deal’s Carpet Care appeals, contending that the workers’ compensation judge:
(1) Committed legal error by applying an incorrect burden of proof against the employer;
(2) erred in finding that Brown had a compensable work injury;
(3) erred in finding that Brown’s preexisting condition was aggravated and/or exacerbated by his work-related accident;
(4) erred in finding that Brown was entitled to workers’ compensation medical benefits;
(5) erred in finding that Deal’s Carpet Care failed to sufficiently rebut the presumption of causation;
(6) erred in finding that Brown’s July 2001 surgery was related to the work accident; and
(7) erred in assessing costs of the July 2001 surgery against Deal’s Carpet Care.
CAUSATION
(Assignments of Error Nos. 1-5)
In these assignments of error, Deal’s Carpet Care contends that the workers’ compensation judge erred as a matter of law by applying a heightened burden of proof with regard to the employer’s burden in overcoming the presumption of causation. Additionally, Deal’s contends that Brown failed to meet his burden of proof with regard to compensability or, alternatively, that Deal’s successfully rebutted any presumption of causation.
hAn employee in a workers’ compensation action has the burden of establishing a causal link between the accident and the subsequent disabling condition. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320, 324 (La.1985). Where the employee suffered from a preexisting medical condition, he may still prevail if he proves that the accident aggravated, accelerated or combined with the condition - or infirmity to produce death or the disability for which compensation is claimed. Peveto, 93-1402 at p. 2, 630 So.2d at 691. Moreover, in a case involving a pre-existing condition, the employee is aided by a presumption regarding causation. Specifically, where an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident disabling symptoms appeared and manifested themselves thereafter, and that the medical or circumstantial evidence indicates a “rea *766 sonable possibility” of a causal connection between the accident and the activation of the disabling condition, the employee’s work condition is presumed to have aggravated, accelerated or combined with his pre-existing disease or infirmity to produce his disability. Peveto, 93-1402 at p. 2, 630 So.2d at 691; Walton, 475 So.2d at 324-325.
With regard to the existence of a pre-existing condition, the medical evidence established that prior to the accident in question, Brown had two conditions of the eye that predisposed him to development of retinal detachment, high myopia and lattice degeneration. High myopia is a condition where an individual’s eyeball is larger than the average eyeball, which causes the retina to be stretched. Lattice degeneration is a condition of the peripheral retina that can lead to holes or tears in the retina, which, in turn, can cause retinal detachment.
17Regarding manifestation of symptoms after the accident, Brown testified that immediately following the accident, he experienced burning in his eyes, which continued for several days to one week. He further related that after the accident, he continued to have problems with his right eye, including fuzziness and loss of peripheral vision, although he attributed these problems to his contacts. Additionally, Brown testified that these problems got progressively worse after the accident until he saw Dr. Aderhold in February of 2001. Brown’s testimony regarding the development of symptoms following the accident was unrebutted and was clearly accepted as credible by the workers’ compensation judge.
Thus, to be entitled to the presumption of causation, Brown had to establish, through medical or circumstantial evidence, that there was a “reasonable possibility” of a causal connection between the accident and the activation of the disabling condition. In this regard, Brown offered the testimony of Dr. Lawrence Aderhold and the written report of Dr. Douglas Babel. Dr. Aderhold, an optometrist, was asked whether being hit in the eye by high pressure spray would generate enough force to cause a retinal tear in the eye of someone who was predisposed to such tears due to myopia and lattice degeneration, and Dr. Aderhold responded, “[i]t’s a possibility.”
Additionally, Dr. Babel, the ophthalmologist who surgically repaired Brown’s retinal detachment, stated in his report that there was “a reasonably good possibility that a retinal tear could have developed at [the time of the accident], which would, of course, have led to the retinal detachment,” and further stated, “I think the degree of probability is reasonably high that this is the scenario.”
Based on this evidence, the workers’ compensation judge determined that Brown was entitled to a presumption that the retinal detachment and |sassociated medical treatment were causally related to the work accident, and we find no manifest error with this finding.
With regard to the workers’ compensation judge’s finding that Deal’s had failed to successfully rebut the presumption of cause, we agree that the workers’ compensation judge misinterpreted the burden placed upon an employer to rebut the presumption of causation. Once the employee has established the presumption of causation, the opposing party bears the burden of pi-oducing evidence and persuading the trier of fact that it is more probable than not that the work injury did not accelerate, aggravate or combine with the pre-existing condition to produce the employee’s disability. Peveto, 93-1402 at pp. 2-3, 630 So.2d at 691. Moreover, while the *767 Louisiana Supreme Court in Walton characterized the employer’s burden as “heavy,” it specifically held that the burden placed upon the employer to rebut the presumption of causation is to prove by a preponderance of the evidence the absence of any correlation between the work injury and the employee’s disability. Walton, 475 So.2d at 328.
Accordingly, to the extent that the workers’ compensation judge held Deal’s Carpet Care to a higher standard by requiring it to rebut the presumption by establishing “absolutely no correlation” between the accident and the employee’s disability or that such a causal connection was “impossible,” the workers’ compensation judge committed legal error. Nonetheless, based on our independent review of the evidence of record, see Tanner v. International Maintenance Corporation, 602 So.2d 1133, 1137-1138 (La.App. 1st Cir.1992), we find that the error was harmless in that the result reached was correct.
In an attempt to rebut the presumption of causation, Deal’s Carpet Care relied upon the testimony of Doctors John Cou-villion and Russell | flSaloom and the medical report of Dr. James Hoth. On the one occasion that Dr. Couvillion, an ophthalmologist who specializes in vitreal retinal surgery, examined Brown, Brown related to him that he had developed decreased vision since an injury to his eye where bleach had gotten into his eye from a pump sprayer. Dr. Couvillion testified that the retinal examination revealed “an obvious large and longstanding retinal detachment of the right eye involving the macula.” With regard to causation, Dr. Couvillion stated, “Whether or not this came from that injury I have no idea.” When asked specifically whether, given Brown’s history as well as his examination of Brown, he believed it was more likely than not that the work accident caused the retinal detachment, Dr. Couvillion responded, “You know, because of the four-month business it’s sort of a gray area.” He noted that if .the accident had occurred only two to three months before his examination of Brown,, he would have opined that there was “[n]o way” that it was related to the accident. However, given that the accident had occurred four months prior to his examination of Brown, Dr. Couvillion recognized that the longstanding detachment could have been caused by the accident.
Defense counsel then asked Dr. Couvil-lion to assume that the pump sprayer involved was not a high-pressure sprayer, but rather a hand pump sprayer someone would use in their garden and that it was no more “powerful than a Super Soaker [water gun].” Dr. Couvillion opined that he would “doubt” that this would have generated sufficient force to cause the retinal detachment. Relying on this testimony, Deal’s Carpet Care contends the presumption of causation was rebutted. We disagree.
Clearly, the assumption that Dr. Couvil-lion was asked to make in the hypothetical is not accurately supported by the only testimony of record regarding the actual mechanics of the accident. The force or power of the |10sprayer mechanism itself seems to be of little relevance inasmuch as there was no testimony that a controlled spray from the nozzle of the sprayer caused the accident. Rather, the record shows that the accident was caused by the failure of the seal around the hand pump, which caused the pressurized contents of the sprayer to shoot upward in an uncontrolled fashion. Moreover, we note that Dr. Couvillion offered the opinion that the work accident did not cause Brown’s retinal detachment only after being asked to make this assumption about the nature of the sprayer. Thus, Dr. Couvillion’s opin *768 ion that he would “doubt” that the retinal detachment was caused by a sprayer with the power of a “Super Soaker” is not dis-positive, given the facts established at trial.[2]
Dr. Saloom, an ophthalmologist, also examined Brown only once, at the request of the employer. This examination occurred on June 12, 2002, after both surgical procedures had been performed to correct the retinal detachment. Although he did not actually view the detached retina, which had previously been repaired, Dr. Saloom nonetheless offered an opinion as to causation. In his testimony, Dr. Saloom framed the issue as whether the force from the spray pump could have caused trauma to the eye that could then lead to retinal detachment. Dr. Saloom admitted that he had not seen the particular pump that was used, but contended he used the same type of pump around his house. He then stated, “I would say, based upon this, it is very highly unlikely but not beyond all realms of possibility that the spray [npump caused the retinal detachment.” When further asked whether it was his opinion that the retinal detachment was independent of the work-related accident, Dr. Saloom responded, “I think unless it can be proved that the hose was directed at the eye and that there was significant pressure come from the hose or whatever, ... [it] is not related.” (Emphasis added). However, it is clear from this testimony that Dr. Sa-loom was under the mistaken impression that the spray that struck Brown in the face and eyes came from the hose, rather than the pressurized contents of the container, after release due to a malfunction of the seal on the container. As stated above, this assumption is not borne out by the evidence presented at trial.
Dr. Saloom also based his opinion that the retinal detachment was not caused by the work accident on the fact that Brown did not seek treatment until four months after the accident. Although he opined that the pressure of a hand pump sprayer “possibly could” have produced enough force to cause blunt trauma if directed towards the eye and that a “temporal relationship” could have existed between the accident and the resulting retinal detachment, Dr. Saloom felt that such an injury would have been significant enough to cause the “average person” to seek medical attention sooner than what Brown did.
However, when asked if his opinion was that the pump sprayer incident did not cause the retinal detachment, Dr. Saloom qualified his statements, as follows:
I cannot tell you if the pump sprayer caused it or not. All I can testify to is that after the accident there was no other records of any other medical attention being sought for an injury until four months later, and the type of injury that I would expect from a hand pump sprayer is minimal, but if somebody said an injury would have occurred, then I would think that the trauma that would be needed to cause a retinal detachment would have brought somebody in the office because it would not — the trauma alone would not have just caused the h ¿retinal detachment. It probably would have caused a traumatic iritis, *769 maybe a traumatic hyphemia, which is blood bleeding in the eye, along with a lot of chemical injury to the eye. (Emphasis added).
Also, although Dr. Saloom placed great weight on the fact that Brown did not seek medical attention for four months, -he acknowledged that it was “absolutely possible” for a person with this type of injury not to seek medical attention. With- regard to his failure to seek medical care sooner, Brown testified that while he experienced pain and vision problems after the accident, he considered himself as one having a high tolerance for pain. Additionally, he stated that he did not seek medical care sooner due to financial constraints.
Finally, Deal’s Carpet Care relied upon the report of Dr. James Hoth, an ophthalmologist who examined Brown on July 26, 2002 solely for purposes of rendering an opinion. In his report, Dr. Hoth concluded that the retinal detachment was present before the accident, because “all parties agree that this man has a Very chronic retinal detachment.... Because of the chronic nature of his retinal detachment, there is no way it could have appeared that quickly after the accident.” With regard to whether the accident contributed to the progression of the retinal detachment, Dr. Hoth stated that the answer to this question was “less clear,” but he believed it had not. The reason he believed that the accident had not contributed to the progression of Brown’s condition was “because after reading the transcripts the amount of force involved was very minimal.” Dr. Hoth further noted that Brown had not sought any medical treatment after the accident, which also indicated to him that there was minimal trauma to the eye. He opined as follows: “The pressure sprayer appeared to be a very mild garden hose 1^variety so this was not a factor and the chemical getting in the eye was certainly not a factor as there was no medical attention sought.”
We note that Dr. Hoth did not examine Brown until after the retinal detachment had been surgically repaired. Thus,'his opinion as to the chronic nature of the retinal detachment is based upon his reading of other doctors’ opinions. The only two ophthalmologists who examined Brown’s eye prior to the surgical repair were' Drs. Couvillion and Babel. AÁTiile Dr. Couvillion noted a long-standing retinal detachment, he acknowledged that the detachment could have developed in the four months between the work accident and his examination of Brown. Moreover, Dr. Babel, the treating ophthalmologist who performed the surgery, also noted upon examining Brown that Brown had a chronic retinal detachment. Nonetheless, Dr. Babel concluded that the probability was “reasonably high” that the accident had caused a retinal tear, which in the intervening four months developed into the retinal detachment with which Brown eventually presented.[3]
Thus, while Dr. Hoth believed the chronic nature of the retinal detachment (as discerned by him from reading medical records) established that the detachment had been present before the accident, this opinion that four months was not sufficient time for a chronic retinal detachment to *770 develop was not shared by the two ophthalmologists who actually examined the injured eye prior to surgical correction.
Additionally, with regard to Dr. Hoth’s statement that the accident had not contributed to the progression of Brown’s condition because “the |14amount of force involved was very minimal” force from a “very mild garden hose variety” sprayer, we again note that there appears to be some misconception as to the actual mechanics of the accident. Clearly, Dr. Hoth did not know or understand that the spray resulted from an uncontrolled release of the pressurized contents of the sprayer due to a failure of the seal on the sprayer itself. Accordingly, given the lack of factual support for Dr. Hoth’s assumptions, we agree that Dr. Hoth’s opinions are not convincing.
Based on the foregoing, and considering the evidence presented as a whole, we conclude, based on our independent review of the record, that Deal’s Carpet Care failed to rebut the presumption that Brown’s retinal detachment was caused by the work accident. Deal’s had the burden of proving that the non-existence of the presumed fact, ie., that the work injury accelerated, aggravated or combined with Brown’s preexisting conditions to produce disability, was more probable than the existence of that presumed fact. See Walton, 475 So.2d at 329. However, the evidence relied upon by Deal’s failed to prove that it was more probable than not that the accident did not accelerate, aggravate or combine with Brown’s preexisting conditions to any extent to produce disability. Accordingly, while we agree that the workers’ compensation judge committed legal error in interpreting the burden placed upon an employer to rebut the presumption of causation, we, nonetheless, conclude that the result reached was correct. Thus, these assignments of error lack merit.
COSTS OF JULY 2001 SURGERY
(Assignments of Error Nos. 6 & 7)
In these assignments of error, Deal’s Carpet Care contends that the workers’ compensation judge was manifestly erroneous in concluding that Brown was entitled to reimbursement for the costs of the July 2001 retinal |1Bsurgery. Specifically, it contends that Brown failed to offer any evidence to establish that the subsequent surgery was also related to the October 10, 2000 work accident.
Louisiana Revised Statute 23:1203 requires the employer to furnish all necessary medical treatment to an employee injured in a work-related accident. To recover medical expenses under LSA-R.S. 23:1203, the employee must prove by a preponderance of the evidence that the expenses are reasonably necessary for treatment of a medical condition caused by the work injury. Taylor v. State, Department of Public Safety and Corrections, 2001-0348, p. 4 (La.App. 1st Cir.3/28/02), 814 So.2d 64, 66. Whether the employee is entitled to medical benefits is a factual question, the resolution of which may not be disturbed in the absence of manifest error. Taylor, 2001-0348 at p. 4, 814 So.2d at 66.
While Deal’s Carpet Care does not contend that Brown did not incur the expense of the July 2001 surgery, it contends that Brown offered no proof to relate the surgery to the work accident. We disagree.
The evidence of record demonstrates that Brown underwent the first surgical procedure to correct a retinal detachment of the right eye on February 12, 2001, and that his treating ophthalmologist related this injury to the work accident. Moreover, a mere five months later, in July of 2001, Brown underwent a second surgical procedure to again repair the right retina. *771 Brown testified that the second surgery was necessitated due to the development of scar tissue resulting from the first surgery. Deal’s Carpet Care offered no evidence to contradict this testimony or to raise any reasonable suspicion that the surgery was unrelated to the accident.
Nonetheless, Deal’s contends that the absence of expert medical testimony stating that the surgery was necessitated by the work accident |ir,requires reversal of the workers’ compensation judge’s award. We disagree and reject Deal’s argument that the failure to call a doctor to specifically state that the work accident was the cause necessitating the additional surgery in July 2001 defeats his claim. Lack of testimony from a physician specifically stating that Brown’s July 2001 eye surgery was necessitated by the work accident is not determinative of whether the accident caused or ultimately resulted in the need for a second surgery. See Connor v. Jones Brothers Enterprises, 606 So.2d 996, 1001 (La.App. 1st Cir.1992), writ denied, 612 So.2d 62 (La.1993).
Causation is not necessarily and exclusively a medical conclusion. It is usually a fact to be found by the workers’ compensation judge, based on all credible evidence. Connor, 606 So.2d at 1001. The testimony of Brown, along with the medical report of his treating ophthalmologist, in the absence of any countervailing evidence, constituted sufficient evidence to establish the necessary causal connection between the work accident and both the February 2001 and the July 2001 surgeries. See Connor, 606 So.2d at 1001. Considering the record as a whole and the lack of evidence to cast suspicion on whether the second surgery was necessary for treatment of a medical condition caused by the work injury, we find no manifest error in the workers’ compensation judge’s finding that Brown was entitled to reimbursement for these expenses. See Connor, 606 So.2d at 1001; see also Collins v. Family Dollar Stores, Inc., 99-0622, pp. 10-11 (La.App. 1st Cir.5/12/00), 760 So.2d 1210, 1217, writs denied, 2000-2356, 2000-2363 (La.11/3/00), 773 So.2d 727. These assignments of error also lack merit.
|17CONCLUSION
For the above and foregoing reasons, the September 19, 2002 judgment awarding Brown medical benefits is affirmed. Costs of this' appeal are assessed against defendant, Deal’s Carpet Care.
AFFIRMED.

. Brown still believed that these problems were contact-related and would be eliminated with a new pair of contact lenses.

. We note that Brown was not present at Dr. Couvillion’s deposition. In fact, on July 22, 2002, the day before the scheduled deposition, Brown filed a motion opposing the taking of Dr. Couvillion’s deposition, noting that he had been given only three days notice of the deposition and would not be able to attend. However, the parties apparently agreed that defense counsel would ask Dr. Couvillion a list of questions submitted by Brown, and, accordingly, Brown withdrew his opposition to the deposition. Thus, Brown was not able to address any misconceptions Dr. Couvillion may have had regarding the nature of how the accident occurred.

. In fact, Dr. Saloom, the employer’s expert who examined Brown on one occasion subsequent to the surgical repair of the. retina, testified that Drs. Babel and Couvillion's statements that the retinal detachment was chronic indicated to him that it had been present for four to six months prior to.the examinations. Such a time frame is clearly consistent with the chronic retinal detachment developing between the time of the accident in October of 2000 and the examinations by Drs. Babel and Couvillion in February of 2001.